Fidele SANON, Petitioner,

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,**
Respondent.

No. 94–2219.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 11, 1995.

Decided April 11, 1995.

Elpidio Villarreal, Ronald S. Bell (argued), Sonnenschein, Nath & Rosenthal, Chicago, IL, for petitioner.

Francesco Isgro, Philemina Jones, Kristen A. Giuffreda (argued), Dept. of Justice, Office of Immigration Litigation, Washington, DC, Samuel Der–Yeghiayan, Christine Young, I.N.S., James B. Burns, Office of the U.S. Atty., Chicago, IL, for respondent.

Before CUMMINGS and FLAUM, Circuit Judges, and PAINE,* District Judge.

FLAUM, Circuit Judge.

Petitioner Fidele Sanon appeals from a denial of asylum and withholding of deportation by the Board of Immigration Appeals. Because the record before us does not reflect that the Board adequately appraised itself of Sanon's case, we vacate the Board's decision and remand for further proceedings.

### I.

Fidele Sanon was born on December 13, 1960, in Bobo Dioulasso, Burkina Faso (then Upper Volta), a former French colony in West Africa. From 1981 to 1985, Sanon attended the University of Ouagadougou, the country's only university, and studied Ameri-

---

* The Honorable James C. Paine of the United States District Court for the Southern District of Florida, is sitting by designation.

can literature. Sanon, who is fluent in English, taught English language courses at a local high school at the same time. Sanon also developed relationships with Americans in Burkina Faso at both the Peace Corps and the United States Information Agency ("USIA"). During the Summer of 1985, the Peace Corps employed Sanon as a translator.

In August, 1983, a military coup led by Captain Thomas Sankara overthrew the government of Burkina Faso and instituted a communist dictatorship. To consolidate his power, Sankara established local groups called Committees in Defense of the Revolution ("CDRs") throughout the country. CDR members served as a government militia, acted as informants, and generally encouraged support for Sankara and his policies. Under the slogan "join or disappear," the government invited everyone to join CDRs, and approximately twenty-five percent of the population opted to sign up. Many who refused to enlist fled the country, and those who stayed without joining were often denied job promotions or faced other indignities.

Sanon, an avowed anti-communist, refused to join and subsequently experienced a number of problems. Before the coup, Sanon had belonged to a student group called the Burkinabe Student Association, which had defended the interests of the students against the government; the Association was dismantled when the CDRs were created. Sanon's students at the high school formed their own CDR, chanted revolutionary slogans in class, and labeled Sanon a "reactionary" because he taught the "language of imperialism." These students also frequently threatened to report Sanon to the authorities because he would not let them address him as "comrade." Representatives from the main CDR headquarters twice came to visit Sanon's school after students complained that the teachers lacked sufficient revolutionary fervor. The second visit so frightened Sanon that he quit his job and temporarily went into hiding in the country.

In 1985, Sanon worked for the Peace Corps in Burkina Faso giving French lessons and cross-cultural seminars to American volunteers. On one occasion, Sanon and his fellow language teachers spoke privately and critically of the Sankara regime. Soon thereafter, he heard a radio broadcast in which details of that conversation were mentioned; someone in the group had reported them to the authorities. The same news report announced that the government was canceling all student exit visas and removing the Minister of Education on suspicion of aiding counter-revolutionary students. Sanon, who had received a Fulbright Scholarship to study in the United States, held one of the canceled visas.

Sanon visited the Ministry of Education to demand the reinstatement of his visa, but new procedures required CDR approval of all visa applications. According to Sanon, the CDR had blacklisted him, but Sanon nonetheless managed to persuade a low-level official to issue him an exit visa without CDR approval in November, 1985. Even with the visa, Sanon feared he would not be allowed to leave. William Weinhold, Director of the USIA in Burkina Faso and Sanon's friend and sponsor, had seen CDR members drag a departing student with a valid visa off an airplane in August. To avoid such an incident, Sanon left the country on a day of national mourning, when no CDR members would be at the airport to stop him, and arranged to have Weinhold accompany him to the airport. Sanon departed successfully, although he subsequently learned that after he left, the government had transferred the Bureau of Passports to the Presidential Palace because no one could determine how he had escaped. Sanon knows of no other students from Burkina Faso who have been able to come to the United States since his departure.

In October, 1987, while Sanon was studying in the United States, a second coup led by Captain Blaise Compaore, Sankara's Minister of Justice, overthrew the Sankara regime. Despite the change, Burkina Faso remained a communist country opposed to United States' policy and political ideals. Compaore disbanded the CDRs but developed similar organizations to mobilize the population and promote revolutionary goals. In fact, Compaore evicted the Peace Corps from Burkina Faso because of its "imperialist" associations. Compaore's government,

like Sankara's, also maintained close ties with Libya.

In the United States, Sanon studied at Ball State University in Indiana and received a Master's Degree in Education. He also applied for and received an extension on his passport until 1991. Sanon's student visa expired, however, on May 22, 1987. On May 8, 1988, the INS issued an Order to Show Cause, charging Sanon with deportability under section 241(a)(2) of the Immigration and Naturalization Act, 8 U.S.C. sec. § 1251(a)(2) (recodified now at section 241(a)(1)(B) of the Act, 8 U.S.C. sec. § 1251(a)(1)(B)), as a nonimmigrant alien who had remained in the United States for a period longer than that authorized. In response, Sanon requested discretionary asylum, 8 U.S.C. § 1158(a), mandatory withholding of deportation, 8 U.S.C. § 1253(h)(1), or, alternatively, voluntary departure to France.

An immigration judge held five proceedings over a ten-month period in 1989 and issued an order granting Sanon's asylum request and withholding deportation on October 13, 1989. The judge found Sanon's story "candid[,] ... credible and worthy of belief" and determined that Sanon had proven both a well-founded fear of persecution in Burkina Faso that qualified him for asylum and a clear probability of persecution that qualified him for withholding of deportation. The immigration judge found that Sanon's association with the Peace Corps, his abrupt exit from Burkina Faso, and his long-term stay in the "imperialist" United States made it more likely than not that he would be persecuted on account of his political beliefs if he returned to his homeland.

The Board of Immigration Appeals (the "Board") reversed the immigration judge's decision. Reaching its decision almost four-and-one-half years later, the Board found Sanon's testimony credible but thought that he had failed to demonstrate a well-founded fear of persecution in his homeland and was therefore ineligible for either asylum or withholding of deportation. The Board doubted that Sanon's association with the Peace Corps or the USIA amounted to the expression of political belief and that he might be harmed because of those associations. The

Board also thought that Sanon was not clearly outspoken about his beliefs or that the government of Burkina Faso had pursued him in the past, or would pursue him in the future, on account of those beliefs. The Board therefore ordered Sanon deported.

## II.

■ Sanon contends on appeal that the Board did not properly consider his case and ordered his deportation despite overwhelming evidence establishing his fear of persecution should he return to Burkina Faso. He asserts that the Board's decision reflects an improper evaluation of his situation. While we decline to grant Sanon's petition, we agree that the Board did not sufficiently address his case and remand for further proceedings.

The Immigration Act provides two procedural paths by which deportable aliens who are currently in the United States and who fear persecution in another country may remain in this country. *Carvajal–Munoz v. INS,* 743 F.2d 562, 563 (7th Cir.1984). First, the Act requires the withholding of deportation of a nonimmigrant alien to his native country "if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1). The Supreme Court has determined that this provision requires the alien to demonstrate a "clear probability" of persecution: "an application must be supported by evidence establishing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds." *INS v. Stevic,* 467 U.S. 407, 429–30, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984); *Demirovski v. INS,* 39 F.3d 177, 180–81 (7th Cir.1994).

■ The Act also gives the Attorney General discretion to grant asylum to an alien in the United States "if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(a). A refugee is defined as a person "unable or unwilling to return" to her country "because of persecu-

tion or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The required showing for eligibility for asylum is less than that for withholding of deportation; a person seeking asylum "need not prove that it is more likely than not that he or she will be persecuted in his or her home country." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987). Instead, that person must demonstrate only a subjective fear of persecution should she return to her homeland and the objective reasonableness of that fear. *Sivaainkaran v. INS*, 972 F.2d 161, 163 (7th Cir.1992). If these showings are made, the Board has traditionally exercised its discretion to grant asylum based on the balancing of a number of relevant factors, most of which relate to the applicant's ties to the United States. *Shahandeh–Pey v. INS*, 831 F.2d 1384, 1387–88 (7th Cir.1987) (listing eight relevant factors).

■ Sanon's burden on appeal is a heavy one. We will uphold a decision of the Board if "supported by reasonable, substantial, and probative evidence on the record considered as a whole," 8 U.S.C. § 1105a(a)(4), and will reverse only where the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 484, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992); *Bevc v. INS*, 47 F.3d 907, 910 (1995). We will affirm the Board's decision where "substantial evidence" supports its finding that a petitioner does not qualify for relief from deportation. *Carvajal–Munoz*, 743 F.2d at 567, 569; *see also Demirovski*, 39 F.3d at 180; *Osaghae v. INS*, 942 F.2d 1160, 1163 (7th Cir.1991).

The facts of Sanon's case are not in dispute; both the immigration judge and the Board found Sanon credible, and the INS does not really deny anything Sanon asserted. *Cf. Sivaainkaran*, 972 F.2d at 165 (noting that the Board expressed doubt as to the veracity of petitioner's story, even though the Board agreed that petitioner had a genuine fear of the general civil unrest should he return to his homeland). The INS even con-

cedes that Sanon has a subjective fear of persecution should he return to Burkina Faso. Rather, the INS argues that on the facts presented, Sanon has not demonstrated a reasonably objective well-founded fear of persecution on account of political opinion that would qualify him for asylum, let alone shown a clear probability of persecution, if he were to return to Burkina Faso.

Our primary concern in this case is the Board's apparent disregard for Sanon's peculiar situation. The Board need not "write an exegesis on every contention" raised. *Vergara–Molina v. INS*, 956 F.2d 682, 685 (7th Cir.1992) (*quoting Becerra–Jimenez v. INS*, 829 F.2d 996, 1000 (10th Cir.1987)). We have previously noted that "our review of asylum applications is most difficult" because of the comparably sparse records these cases tend to produce as well as their sluggish progress through the administrative system. *Balazoski v. INS*, 932 F.2d 638, 642 (7th Cir.1991). Accordingly, because of the fact-sensitive nature of these cases and because we do not fashion ourselves experts in immigration or foreign affairs, we tend to defer to the Board. *Id.* at 642–43.

Nonetheless, we require some proof that the Board has exercised its expertise in hearing a case. For example, in *Osaghae v. INS*, the INS sought to deport a Nigerian student who had overstayed his visa. We there determined that the Board's consideration of Osaghae's activities in the Biafran independence movement within Nigeria was "cryptic" and "incomprehensible" and ultimately concluded that the Board's analysis was "so deficient ... that we have the gravest doubt that its finding that Osaghae lacks a well-founded fear of persecution if deported to Nigeria is supported by sufficient evidence even in the record that was before the Board." *Osaghae*, 942 F.2d at 1163. We concluded that "nothing in the Board's opinion suggest[ed] that the Board is knowledgeable about Nigeria" and remanded for consideration of additional evidence. *Id.* at 1164; *see also Bastanipour v. INS*, 980 F.2d 1129, 1133 (7th Cir.1992) ("The Board's handling of the question ... makes us wonder whether the Board's knowledge of Iran is any greater than its knowledge of Biaf-

ra....."); *Shahandeh–Pey,* 831 F.2d at 1389 ("A decision that does not reflect, even at some minimal level, consideration of important aspects of an individual's claim is one made, for all a reviewing court can know, 'without rational explanation.'").

The present case is comparable to *Osaghae.* As in *Osaghae,* little in the Board's opinion here suggests it has considered the situation in Burkina Faso. Although Sanon managed to flee from Burkina Faso on a valid exit visa, the record indicates that he escaped because of error and that he is the only student to make it to the United States. That the CDRs did not catch up with Sanon may simply testify to the state of the governmental infrastructure in Burkina Faso, a country with a highly rural population, low literacy rates, poor communications networks, and, as of 1988, a per capita annual income of $140. Admin.Rec. at 511. Given that both the Board and the immigration judge credited Sanon's testimony, we are troubled by the Board's emphasis that nothing has happened to Sanon's family in Burkina Faso when Sanon has stated that he has been unable to speak with them and suggested that they feared retribution should they contact him. Furthermore, the Board appears to have given little consideration as to how the Compaore government, given its decision to ban the Peace Corps from Burkina Faso, would react to Sanon. In a case in which the reasonableness of fears of persecution on account of political belief is at issue, the Board should address these issues.

The government's attempts to justify the Board's decision are also somewhat strained. The INS points out that Sanon presented no evidence regarding anyone else who studied abroad and returned to Burkina Faso. Our research reveals no reported cases, either in the federal courts or in front of the Board, in which Burkina Faso or Upper Volta was ever even mentioned. To demand comparative statistics in such a case seems unreasonable. The INS also remarks that only twenty-five percent of the population joined the CDRs. Such a statistic is hardly telling and, if anything, is high; similar percentages for Hitler's Germany and Stalin's Soviet Union are far lower.[1] The INS also compares this case to *Carvajal–Munoz, supra,* in which we upheld the Board's denial of asylum despite the fact that Carvajal–Munoz had been arrested ten times in his native Argentina. Yet in *Carvajal–Munoz,* the Board did not think the arrests had been made in conjunction with any political activity based on a lack of specificity in Carvajal–Munoz's testimony and a lack of affidavits or any other information supporting his assertions. 743 F.2d at 578. Indeed, the Board indicated its doubt that Carvajal–Munoz's problems in Argentina had much to do with his politics. *Id.* Since the Board in the instant case explicitly found that Sanon was a credible witness and assumed that his associations and actions could be categorized as political beliefs,[2] and since Sanon did present specific facts and other information to support his testimony, *Carvajal–Munoz* is not on point.

■ We are nonetheless reluctant to reverse the Board decision and grant Sanon's requests for withholding of deportation or asylum. Where an agency has failed to comply with its responsibilities, we should insist on its compliance rather than attempt to supplement its efforts. We are not necessarily convinced on this record that Sanon was eligible for withholding of deportation or asylum as a matter of law. *Cf. Zulbeari v. INS,* 963 F.2d 999, 1000–01 (7th Cir.1992); *Balazoski,* 932 F.2d at 641–42. We are convinced,

1. In May, 1943, near the height of Nazi Party membership, about twenty-three percent of all adult male Germans belonged to the party; total membership was only 7.6 million persons in a population near 60 million. Aryeh L. Unger, THE TOTALITARIAN PARTY· PARTY AND PEOPLE IN NAZI GERMANY AND SOVIET RUSSIA 85 & n. 5 (Cambridge 1974). Although figures for the Soviet Union are less reliable, Communist Party membership constituted not quite ten percent of all Soviet adults as of 1973, and that percentage had never been higher. *Id.* at 105.

2. We note that the "political opinion" language in the asylum and withholding of deportation statutes is not necessary limited to traditional associations with one political party or faction. *See, generally,* Mark G. Artlip, Comment, *Neutrality as Political Opinion: A New Asylum Standard for a Post–Elias–Zacarias World,* 61 U.Chi.L.Rev. 559 (1994).

however, that the Board did not address adequately the issues Sanon's petition raised.

Finally, we would also like to register our disappointment with certain of the government's efforts in this case. The most recent information in the record concerning Burkina Faso dates to 1989. Since the government desired to press its case after the initial grant of asylum and withholding of deportation in 1989, it should have supplemented that record in some way. As matters stand, we do not know the state of affairs in Burkina Faso today. We certainly cannot presume, as the INS suggested at argument, that the general state of the world has improved since 1989. We appreciate that the INS faces large administrative burdens, but we would hope for more diligence on the government's part in the future.

For the foregoing reasons, we vacate the Board's decision and remand for further proceedings consistent with this opinion.

VACATED AND REMANDED.