139 F.3d 902
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Jelili QUDUS, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 297-2815.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 28, 1998*.
Decided Feb. 10, 1998.
 
 Petition for Review of an Order of the Board of Immigration Appeals. No. Arh-pyq-miy.
 Before ESCHBACH, MANION, and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Jelili Qudus, a Nigerian citizen, appeals the denial of his asylum application. He claims that he faces prosecution on his return to Nigeria on account of his conviction in this country for conspiracy to sell social security cards, a crime involving fraud or deceit. Because this fear of prosecution does not suggest a well-founded fear of persecution, we affirm.
 
 I.
 
 2
 Jelili Qudus is a 29-year-old unmarried Nigerian citizen with a 2-year-old child who is a U.S. citizen. He entered the United States on February 25, 1992 as a nonimmigrant visitor for business to attend a training seminar in New York City. His visa expired on March 24, 1992, but Qudus stayed anyway, purportedly to further his education in the United States. However, because he could not afford the tuition, Qudus never enrolled in any educational programs,. Qudus filed an application for asylum on June 28, 1993, in which he claimed that he had been persecuted on account of his membership in the Social Democratic Party, the leading opposition party in Nigeria .[1] The 1993 asylum application stated that Qudus had been arrested in Nigeria in September 1990, and "interrogated and tortured continuously" during his three months in custody. The INS never adjudicated this application.
 
 
 3
 After filing his initial asylum application, Qudus eventually made his way to Chicago, where from January to September 1994 he was part of a conspiracy to sell social security cards to aliens. Qudus pleaded guilty to his part in the conspiracy, and was sentenced to 12 months' imprisonment, two years of supervised release, and a $3,000 fine. Qudus was confined in Oakdale, Louisiana. On June 6, 1995, while Qudus was still imprisoned, the INS issued Qudus an order to show cause why he should not be deported. The Order charged him with deportability pursuant to 8 U.S.C. § 1251(a)(1)(B) (1994) (now codified as amended at 8 U.S.C. § 1227) for overstaying his visa, and § 1251(a)(2)(A)(1) for committing a crime involving moral turpitude within five years of entry punishable by a sentence of one year or longer.
 
 
 4
 At his initial hearing, Qudus was counseled and contested his deportability, but the immigration judge (IJ) found that Qudus was deportable by "clear, convincing and unequivocal" evidence. After the judge found him deportable, Qudus again asked for political asylum and alternatively for withholding of deportation. Qudus's deportation hearing was continued while he completed his asylum application and found a new lawyer. Qudus returned to Chicago after his release from prison, and filed a motion to change the venue of the deportation hearing from Louisiana to the Chicago immigration court, which was granted.
 
 
 5
 The asylum hearing was held on August 2, 1996. At the hearing, Qudus disclaimed any past persecution; he admitted that the allegations of his mistreatment on his original asylum application were false, and that he had never been arrested, beaten or tortured in Nigeria. However, Qudus claimed that he feared persecution if he was forced to return on account of his political opinions, and because of his U.S. conviction..
 
 
 6
 Qudus submitted several pieces of evidence in support of his fear of persecution on account of his political opinion. Qudus showed that he was a member of the Social Democratic Party in Nigeria for five months before leaving for the United States. He submitted a letter and envelope from a friend, in which the friend indicated that Qudus would be "picked up at the airport" if he returned to Nigeria. Suspiciously, however, the letter was dated two days after the postmark on the envelope. The letter also contained a "wanted" ad from a Nigerian newspaper dated November 28, 1993, allegedly placed by the Nigerian government, that indicated that Qudus was "among the rest wanted people of the SDP." (sic)
 
 
 7
 In support of his claim that he would be persecuted because of his conspiracy conviction, Qudus submitted a copy of a Nigerian decree stating that "[a]ny person who has been tried and convicted of an offence of Fraud and Deceit ... notwithstanding that such a person has served a prison term in that foreign country, shall be guilty of an offence" and "shall be liable to imprisonment for a term of five years without an option of fine and his assets and properties shall be liable to forfeiture." 77 Fed. Repub. Nigeria Official Gazette A569 (1991) (Decree 33B). The decree "allows the trial of a Nigerian citizen who has brought the name Nigeria into disrepute by committing an offence relating to fraud and deceit or hard drugs in a foreign country." Id. at A570 (explanatory note).
 
 
 8
 In a written ruling, the IJ found Qudus not credible on account of his previous fraud conviction, the inaccuracies in his initial asylum application, and the inconsistent dates on the letter and envelope. The IJ found that Qudus did not have a well founded fear of future persecution, and rejected his claim for asylum. Qudus appealed to the BIA, and the BIA dismissed his appeal on June 20, 1997. The three-page BIA opinion consists almost entirely of discussion approving the IJ's credibility determination. In a single paragraph, the BIA's opinion dealt with the threat that Qudus would be prosecuted on return to Nigeria:
 
 
 9
 The respondent argues also that the possibility of imprisonment in Nigeria for the crime he committed in the United States would constitute double jeopardy and cruel and unusual punishment in light of the State Department report. This argument lacks merit. The respondent argues that he fears that he will be imprisoned, but presents no evidence that this will occur. Furthermore, the protections against double jeopardy and cruel and unusual punishment in the United States Constitution do not, per force, apply outside the boundaries of the United States.
 
 
 10
 Qudus appealed to this court on July 18, 1997.
 
 II.
 
 11
 The Attorney General has discretion to grant asylum to any alien who qualifies as a "refugee." 8 U.S.C. § 1158(a). To qualify as a refugee, an alien must be "unable or unwilling to return" to his country of origin because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." 8 U.S.C. § 1142(a)(42)(A). A "well-founded" fear must be both genuine and reasonable, in light of specific, credible evidence. See Najafi v. INS, 104 F.3d 943, 946 (7th Cir.1997).
 
 
 12
 The IJ's determination that Qudus is not a refugee is a factual determination reviewed under the substantial evidence test. See Sanon v. INS, 52 F.3d 648, 651 (7th Cir.1995). This determination will be upheld if it is "supported by reasonable, substantial, and probative evidence on the record as a whole." 8 U.S.C. § 1105a(a)(4). This is a deferential standard, and the IJ's finding can only be reversed if the evidence compels an opposite result. See INS v. Elias-Zacharias, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).
 
 
 13
 Qudus does not claim that he was persecuted prior to leaving Nigeria in 1992; rather, he claims that he has a well-founded fear of persecution based on his political opinion. While Qudus argued to the BIA that his activities with the SDP would lead to persecution, he has waived this argument because he fails to argue this on appeal. See Bereza v. INS, 115 F.3d 468, 474 (7th Cir.1997).
 
 
 14
 Qudus claims that the decree subjecting him to prosecution and a potential five-year sentence if he returns to Nigeria subjects him to persecution on account of his political beliefs. Qudus argues that the decree's explanatory note shows that the Nigerian government wants to punish Qudus because he has embarrassed Nigeria, and by imputing an intent to embarrass Nigeria to him, they are punishing a political opinion. The INS argues in its brief that Qudus has waived this argument, because Qudus did not argue that the prosecution was on account of his race, religion, nationality, political opinion or social group to the agency. Arguably though, Qudus did not waive this argument. Qudus did claim persecution because of his political opinions to the BIA, though he didn't stress the link between the future prosecution and his political beliefs to the BIA. Since the INS was on notice that Qudus was claiming asylum on account of political opinion, waiver is not necessarily appropriate here.
 
 
 15
 Even if the argument is not waived, Qudus's argument still fails. While the Immigration and Nationality Act does not define "persecution," this court has construed the term to include "punishment for political, religious, or other reasons that our country does not recognize as legitimate." Osaghae v. INS, 942 F.2d 1160, 1163 (7th Cir.1991). Prosecution for violation of laws of general applicability does not amount to persecution, unless the prosecution is for a "nefarious purpose." Sharif v. INS, 87 F.3d 932, 935 (7th Cir.1996). The decree that Qudus may be subject to on his return to Nigeria punishes those who are convicted of drug dealing, or of acts involving fraud or deceit. In a strained argument, Qudus tries to show that this decree threatens punishment based on political belief. This is a frivolous contention. Committing an act of fraud or selling drugs does not constitute political opinion. It would be one thing if Qudus claimed that he would be persecuted because he believed that defrauding people (or governments) is acceptable, or that dealing drugs should not be punished, but it is another thing entirely to complain that a government may punish those who commit such acts.
 
 
 16
 Qudus further complains that the BIA did not adequately consider his claim that he feared imprisonment in Nigeria based on his conviction in this country. The BIA does not have to "write an exegesis on every contention raised," see Sanon, 52 F.3d at 651, but it must provide some indicia that it has "heard and thought and not merely reacted." Casteneda-Suarez v. INS, 993 F.2d 142, 146 (7th Cir.1993). While the BIA treated this issue in only a single paragraph, the paragraph mentions and disposes the arguments the petitioner submitted to the BIA about the conviction. The crux of Qudus's argument to the BIA was that the subsequent prosecution of Qudus in Nigeria for his crimes here would constitute double jeopardy and cruel and unusual punishment. The Board's opinion correctly dismissed these claims by noting that these constitutional provisions do not apply to Nigeria. Thus, the Board's opinion is sufficiently reasoned, and withstands Qudus's attack.
 
 
 17
 Qudus tries again to assert the double jeopardy argument in his brief to this court, raising for the first time the argument that his prosecution would violate established international human rights standards and treaties. However, because Qudus did not raise this argument in front of the BIA, this argument is waived. See Bereza, 115 F.3d at 474. Thus, we affirm the BIA decision.
 
 
 18
 AFFIRMED.
 
 
 
 *
 This case was originally scheduled for oral argument on January 28, 1998, but counsel for the petitioner failed to appear on the scheduled date. Pursuant to Fed.R.App.P. 34(e), the court heard argument from the respondent, and we decide this case without oral argument from the petitioner
 
 
 [1]
 Nigeria is ruled by a military junta. The current military ruler, General Sani Abacha, took power when he overthrew the previous military leader. General Ibrahim Babangida, in a 1993 coup. The October 1995 State Department profile of Nigerian asylum claims, included in the record, branded Nigeria's human rights record "dismal," noting that the government "regularly relied on arbitrary detention and mass arrest as a means of silencing its many critics."