IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-41155
_____


MAMDOUH L. ABDEL-MASIEH,

                                        Petitioner,

        versus

UNITED STATES IMMIGRATION AND
NATURALIZATION SERVICE,

                                        Respondent.


_____

Petition for Review of and Order of the Immigration
            and Naturalization Service
_____
                January 15, 1996

Before WISDOM, GARWOOD and JONES, Circuit Judges.

GARWOOD, Circuit Judge:

        The Immigration and Naturalization Service (INS) initiated

deportation proceedings against Mamdouh Abdel-Masieh (Abdel) on

December 4, 1990.   The immigration judge found Abdel to be

ineligible for asylum and for withholding of deportation under the

Immigration and Naturalization Act.   The Board of Immigration

Appeals (BIA) affirmed the immigration judge's decision and

dismissed Abdel's appeal.   Abdel brings this petition to review the

final order of deportation pursuant to 8 U.S.C. § 1105a(a).   We

vacate the order of deportation and remand to the BIA.

## Facts and Proceedings Below

Petitioner Abdel is a thirty-two year old native and citizen of Sudan. He was employed in Sudan as an aircraft mechanic and engineer, an occupation which he has characterized as well-paying. Abdel is a member of the Coptic faith, a Christian denomination comprising a small fraction of the Christian minority residing in the predominantly Muslim nation of Sudan. In the aggregate, ten percent of Sudanese citizens are Christians. Prior to leaving Sudan for the United States, Abdel resided in Sudan most of his life, leaving only for a two and one-half year period of study in India from 1985 to 1987.

In June 1989, the democratically elected government of Sudan was overthrown in a military coup and replaced by a military government heavily influenced by the National Islamic Front (NIF). The new government quickly instituted a drive to Islamicize Sudan, replacing secular judges with Islamic ones, and imposing the Islamic *Shari'a* laws on all Sudanese people, Muslim and non-Muslim alike.[1] The imposition of the *Shari'a* on non-Muslim Sudanese, which provides for such harsh penalties as amputation, stoning, and lashes, has raised a volatile issue in that nation, an issue which is important in the civil war raging in the southern portion of Sudan.

---

[1] Abdel concedes that the difficulties for Christians can be traced to 1983, when Sudan was governed by Chatrin Numary. Numary initiated the application of *Shari'a* in Sudan, and Abdel testified that Numary's government and the current NIF government are closely associated.

In August 1989, soon after the NIF government seized power, Abdel participated in a demonstration against the government's efforts to apply the *Shari'a* to all Sudanese citizens. From a group of two hundred protesters, twenty-five to thirty were arrested, including Abdel. During his three-hour detention, Abdel was interrogated and beaten. Before releasing Abdel, the officials recorded his name and other identifying information, but filed no charges against him.

Then, in late December 1989 or early January 1990, one of Abdel's cousins was arrested and ultimately executed by the government for allegedly carrying United States currency in an airport. This cousin was the son of a Coptic priest who was a leader in the Sudanese Coptic community. Trials of the sort afforded to Abdel's cousin were summarily conducted by military tribunals, and the accused were denied representation by counsel. In January 1990, the funeral procession for Abdel's cousin evolved into a large demonstration against this perceived religious persecution.[2] In an effort to prevent the funeral procession, comprised of an estimated 10,000 protestors, from passing in front of the United States embassy in Khartoum, security forces arrested approximately 20 demonstrators, including Abdel. He was again detained for three hours, during which time he was interrogated and beaten. After his release, Abdel was picked up again for an

_____

[2] Abdel noted the contrast between the capital sentence imposed against his cousin and the minimal sentences received by five members of an Islamic terrorist organization convicted of killing seven people in an attack on a Khartoum hotel.

additional two hours.  As was the case with his August 1989 arrest, Abdel was not charged upon his release.  He was able to return to work after each of these episodes involving the police, and ultimately left his employment voluntarily in February 1990.

On February 24, 1990, Abdel entered the United States as an "M-1" nonimmigrant student pursuant to 8 U.S.C. § 1101(a)(15)(M). He testified that he left Sudan for the United States for two reasons:  first, he sought to advance his education and obtain a permit related to his aircraft engineering vocation; second, he hoped to escape his conflict with the government of Sudan.  He further testified that he was able to obtain his passport renewal—on January 6, 1990—and visa only through the help of a brother-in-law with American connections.  It is clear that many Sudanese in suspect classifications have great difficulty obtaining passports and exit visas.  Since his arrival in the United States, Abdel has worked as a cash register attendant in a gas station.

Abdel points to several events which have occurred since his departure from Sudan in support of his contention that he will face persecution if he returns to that nation.  He indicated in his application for asylum that his mother, formerly a department director of a textile factory, was fired because of her religious beliefs.  Abdel's brother, who operates his own business, was arrested, detained, and beaten by Sudanese security forces in an effort to obtain information regarding Abdel.  Abdel's brother and a co-worker have warned Abdel not to return to Sudan under any circumstances.  Abdel testified that he is on a "wanted list" at

4

the Khartoum airport, although he concedes that he has never seen this list and does not explain how he knows he is on it. Additionally, individuals assumed by Abdel to be government agents have on several occasions made inquiries at his former place of employment regarding his whereabouts and the duration of his stay in the United States. Finally, Abdel has indicated that his family's telephone conversations and mail have been monitored, a practice which the United States Department of State has characterized as pervasive in Sudan.

Abdel's student visa expired on March 26, 1990, and deportation proceedings were commenced against him on November 26, 1990. Abdel conceded deportability in these proceedings, and the immigration judge denied his application for asylum or temporary withholding of deportation. Pursuant to 8 U.S.C. § 1254(e), Abdel was given two months to voluntarily depart the United States.

Abdel appealed this decision to the BIA, and the BIA dismissed Abdel's appeal on October 5, 1994. Abdel timely brought the present petition before this Court to review the BIA's final order of deportation pursuant to 8 U.S.C. § 1105a(a).

### Discussion

Abdel seeks asylum pursuant to 8 U.S.C. § 1158(a). This section of the Immigration and Naturalization Act (INA) affords asylum to aliens who are "refugees", defined by the INA as:

> "[A]ny person who is outside any country of such person's nationality ... who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social

group, or political opinion ..." 8 U.S.C. § 1101(a)(42)(A).

We review the BIA's factual determination that Abdel is not a "refugee" within this definition, and therefore that Abdel is not eligible for asylum nor for withholding of deportation, under the substantial evidence standard. *Ozdemir v. INS*, 46 F.3d 6, 7 (5th Cir. 1994)(citations omitted); *Adebisi v. INS*, 952 F.2d 910, 912 (5th Cir. 1992)(citations omitted). The errors or other failings of the immigration judge's opinion are considered only if they have some impact on the BIA's decision. 952 F.2d at 912.

## I. Past Persecution

The BIA agreed with the immigration judge's finding that Abdel's two arrests did not rise to the level of "persecution" contemplated by the INA. After reviewing the facts surrounding Abdel's two arrests, the BIA cited three cases to support its finding that these arrests did not constitute persecution. However, in all three of these cases, the prisoners were not mistreated during their respective detentions. *See Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990)(Zalega, though arrested and interrogated five times, with detentions of up to thirty-six hours, "was not mistreated while incarcerated"); *Mendez-Efrain v. INS*, 813 F.2d 279, 283 (9th Cir. 1987)(four days' detention; "There is no indication that [Mendez] was tortured or molested while in detention"); *Kubon v. INS*, 913 F.2d 386, 388 (7th Cir. 1990)(no evidence that Kubon was mistreated during his five-day detention). Additionally, in *Zalega* and *Kubon*, the Seventh Circuit also relied on the improving political situation in Poland to justify its

6

affirmance of the BIA's denial of asylum in both cases. 913 F.2d at 388; 916 F.2d at 1261 n.5. None of the evidence in the present case suggests a similar "improvement" is on the horizon in Sudan. On the other hand, in each of those cases the detention was for substantially longer than here.

While the term "persecution" under the INA is by no means well-defined, the BIA *has* provided some insight into the working parameters of this term:

> "[T]he infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive (*e.g.*, race, religion, political opinion, etc.), in a manner condemned by civilized governments. The harm or suffering need not be physical, but may take other forms, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life." *Matter of Laipenieks*, 18 I&N Dec. 433, 456–457 (BIA 1983), *rev'd on other grounds*, 750 F.2d 1427 (9th Cir. 1985).[3]

In *Laipenieks*, the BIA applied this interpretive language and determined that:

> "While punishment of criminal conduct in itself is not persecution, where that punishment entails such things as severe beatings or being sent to a Nazi concentration camp—i.e., is 'excessive or arbitrary'—and is motivated by one of the specified grounds, such punishment would constitute persecution under the Act." *Id.* at 459 n. 18.

Abdel asserts that he was twice arrested, twice detained, and beaten on both occasions. As Abdel's credibility has not been impugned in these proceedings, his testimony may be sufficient to sustain his burden of proof without corroboration. 8 C.F.R. §

---

[3] *See also Osaghae v. INS*, 942 F.2d 1160, 1163 (7th Cir. 1991) (persecution encompasses "punishment for political, religious, or other reasons that our country does not recognize as legitimate").

208.13(a). However, Abdel does not in his testimony characterize the beatings he received as "severe", nor does he demonstrate that his detentions were "excessive or arbitrary". He was never detained overnight. Most importantly, Abdel fails to establish that he was singled out and arrested on either occasion due to his religious or political affiliations. Abdel was twice arrested while participating in large, public demonstrations. He has not demonstrated that the treatment he received was different than that which would have been received by any other participant in a public disturbance in Khartoum. It seems plausible that Abdel may have been arrested on both occasions simply because he was at the front of the crowd. There is no evidence to the contrary. Each time he was detained, the authorities were apparently unaware of his identity. In short, it is by no means clear that Abdel's mistreatment was motivated by his "differ[ences] in a way regarded as offensive (e.g., race, religion, political opinion, etc.)." Thus, we cannot say that the BIA erred in finding that Abdel has not suffered past persecution.

II. Well-Founded Fear of Future Persecution

In concluding that Abdel failed to demonstrate a well-founded fear of future persecution, the BIA noted that:

> "If the government was interested in persecuting the respondent, they [sic] had ample opportunity when he was in their [sic] custody twice. Particularly the second time the respondent was in custody the government had full information about who he was and what he had done. Nevertheless, the government released him after a relatively short period of detention."

The BIA has apparently taken the position that, since Abdel

8

was not—during his two episodes of detention and beating—mistreated to such a degree that his experiences would constitute "persecution", he should not fear persecution by the Sudanese government in the future. Without more, this reasoning by the BIA is unpersuasive. There is little reason to generally suppose that a government's past actions in this respect create an "outer limit" on its future actions. In fact, the evidence in the record suggests that the opposite is true in the present case; since the time of Abdel's second arrest, the Sudanese government has become even more active in this context. Abdel's mother, who still had her job at the time of Abdel's second arrest, was subsequently fired due to her religious beliefs. Also after the second arrest, Abdel's brother was detained and beaten, not because he participated in any civil protest, but because the Sudanese security forces wanted additional information regarding Abdel. The evidence further suggests that, while the government's involvement with Abdel in the past was reactive—reacting to public demonstrations in which he participated—the Sudanese government has now taken the initiative to locate Abdel for purposes as yet unknown. In addition, it is clear that the Sudanese government can be ruthless with regard to its own citizens. The United States Department of State *Country Reports on Human Rights Practices for 1991* (February 1992) for Sudan indicate that the government has likely perpetrated any number of heinous atrocities against its citizenry. Twenty-five civilian residents of southern Sudan disappeared in 1991, purportedly the result of military executions

9

relating to the civil war in that region. *Id.* at 378. Additionally, the State Department reports that persons suspected of activity against the Sudanese government have been whipped, clubbed, shocked with electricity, kicked in the ribs and kidneys, bound for long periods, boiled, and psychologically tortured. *Id.*

Responding to the evidence brought forward by Abdel, the BIA found that:

> "The fact that unidentified people were asking questions about the respondent at his former work place does not show that the government may now be inclined to persecute him upon his return to Sudan. He was supposed to return to Sudan and his job there after a 3-month period of study in the United States. He does not alleged that the government has discovered any new facts about him which might change their interest in him."

This paragraph constitutes the BIA's complete analysis of the evidence introduced by Abdel pertaining to the developments which have occurred in Sudan since Abdel's departure to the United States. We do not require the BIA to specifically address every piece of evidence put before it, but, in the present case, the BIA has failed to address much of Abdel's key evidence in this respect. The BIA makes no mention of Abdel's testimony regarding the firing of his mother or the beating and questioning of his brother.[4]

As the BIA found that Abdel did not have a well-founded fear of persecution, it is settled that we may not conclude that he did unless the evidence is "such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed."

---

[4] And, the asserted appearance of Abdel's name on a wanted list at the airport is not mentioned.

*INS v. Elias-Zacarias*, 112 S.Ct. 812, 815 (1992). Nevertheless, we generally also review the BIA's decision "'procedurally' to ensure that the complaining alien has received full and fair consideration of all circumstances that give rise to his or her claims." *Zamora-Garcia v. INS*, 737 F.2d 488, 490 (5th Cir. 1984). While we do not require that the BIA address evidentiary minutiae or write any lengthy exegesis, *Ramos v. INS*, 695 F.2d 181, 189 (5th Cir. 1983), its decision must reflect meaningful consideration of the relevant substantial evidence supporting the alien's claims. *Id*. at 188. *See also Diaz-Resendez v. INS*, 960 F.2d 493, 495, 497-98 (5th Cir. 1992); *Ganjour v. INS*, 796 F.2d 832, 839 (5th Cir. 1986).

In a recent case involving an alien's appeal of a BIA decision denying his application for asylum, the Seventh Circuit recognized the petitioner's heavy burden on appeal in light of the Supreme Court's language in *Elias-Zacarias*. *Sanon v. INS*, 52 F.3d 648, 651 (7th Cir. 1995). Also recognizing the fact-sensitive nature of such cases, together with the general observation that appellate judges are often not experts in immigration or foreign affairs, the court noted its tendency to defer in such matters to the BIA. Nevertheless, the court observed that it must "require some proof that the Board has exercised its expertise in hearing a case." *Id.* After noting the BIA's failure to adequately consider the situation in Sanon's country—Burkina Faso—as well as Sanon's evidence that his family was afraid to contact him, the court held that the BIA should address these issues on remand. *Id. at 651-52.* In the present case, the BIA has likewise failed to expressly address the

11

relevant conditions in Sudan and the experiences of Abdel's family members and co-workers since his departure for the United States. In *Sanon*, the Seventh Circuit held that, "Where an agency has failed to comply with its responsibilities, we should insist on its compliance rather than attempt to supplement its efforts." *Id.* at 652. We find this approach to be appropriate in the present case.

In concluding that Abdel failed to make the requisite showing that the Sudanese government had the ability to seek him out, the BIA found that:

> "The respondent lived in the capital city of Sudan. He stated that he never lived in the southern part of the country. He stated that the southern part of the country is predominantly Christian. The respondent has the burden of showing he could not live in southern Sudan."

In support of its conclusion that Abdel had failed to make the requisite showing in this regard, the BIA cited *Matter of R-*, Interim Decision 3195 (BIA 1992), for the proposition that,

> "[A]n alien seeking to meet the definition of a refugee must do more than show a well-founded fear of persecution in a particular place or abode within a country——he must show that the threat of persecution exists for him country-wide."

The BIA appears to have relied on the opinion of the immigration judge, who stated that Abdel "could probably live in safety in those sections of Sudan ... where Christians constitute the majority of the particular community."

We hold that the BIA erred in finding no reasonable likelihood of persecution on the theory that Abdel could escape persecution by living in southern Sudan where Christians were in the majority. The immigration judge *sua sponte* reached the above conclusion——that

12

Abdel could probably live in safety in southern Sudan—*after* the deportation hearing was concluded; the INS had not previously raised this issue and Abdel had no opportunity to address it during the hearing.[5] Furthermore, there is no substantial evidence in the record to support the BIA's holding that Abdel failed to establish a likelihood of persecution on a country-wide basis. Abdel brought forward evidence that the NIF-dominated military government has consistently promoted an agenda for imposing the Islamic *Shari'a* laws on *all* Sudanese citizens, and that these efforts by the government have markedly increased religious intolerance and discrimination throughout Sudan. The INS has presented no evidence which might suggest that the efforts or influence of the present military government in Sudan are localized.[6]

The Ninth Circuit recently addressed the issue of whether a

---

[5] In his appeal of the immigration judge's ruling to the BIA, Abdel introduced evidence that the concentration of Sudan's Christian citizens in the southern part of the country explained why the civil war was raging in that region, also noting that the United States Department of State has characterized considerable portions the southern region of Sudan as "largely unpopulated and plagued by banditry". *Country Reports, supra,* at 376. These reports also observe that 4.5 million Sudanese have been displaced by the civil war in that nation. *Id.* Even if we were to agree that relocation to southern Sudan would free Abdel from persecution at the hands of Sudanese security forces, it seems unreasonable to expect him to make such a move under the present circumstances. In addition, nothing of record suggests that Abdel would be able to avoid flying back into Khartoum if he is deported; we suspect that Abdel's efforts to bypass Khartoum and travel directly to southern Sudan would be difficult, if not impossible.

[6] The INS states twice in its brief to this Court that Abdel conceded the probability that he could live safely in the southern part of Sudan. This is inaccurate. The INS's citations in support of these statements are to the immigration judge's findings, not to any testimony given by Abdel.

13

petitioner must prove that the persecution he faces is "country-wide" when the alleged "persecutor" is the national government. *See Singh v. Moschorak*, 53 F.3d 1031 (9th Cir. 1995). The petitioner in *Singh* was a Sikh who had been persecuted by the national Indian army in his home state of Punjab. The Ninth Circuit held that:

> "[T]he district court remanded to the [BIA] to determine if Singh can 'live safely in another region of India' distinct from his home. The district court apparently believed that Singh would not qualify for asylum if his persecution by India for political opinion was confined to the Punjab. Such is not the law ... We have recognized that where there was a danger of persecution in a single village from guerillas who knew the petitioner, and no showing of such danger elsewhere in the country, the petitioner failed to establish eligibility for asylum. The [INS] argues by analogy that these cases control this case. But where the persecution is by the government of the nation no such distinction may be taken ... It has never been thought that there are safe places within a nation when it is the nation's government that has engaged in the acts of punishing opinion that have driven the victim to leave the country." *Id.* at 1034 (citations omitted).

Without deciding whether we agree with the Ninth Circuit's ultimate reasoning and conclusions in *Singh*, we recognize that the Ninth Circuit properly allocated the parties' respective burdens in such a case. When a party seeking asylum demonstrates that a national government is the "persecutor," the burden should fall upon the INS to show that this government's persecutive actions are truly limited to a clearly delineated and limited locality and situation, so that the applicant for asylum therefore need not fear a likelihood of persecution elsewhere in the nation. The INS made no such showing in the present case. Moreover, that an alien (at least one whose residence in a country was in that part of it under

14

the government's control) might be safe from persecution by the national government in other areas of the nation (such as those under rebellion) where the government's writ does not run, does not suffice to show that the alien lacks the requisite fear of persecution.

## Conclusion

For the foregoing reasons, the Board of Immigration's order of deportation is VACATED, and the case is REMANDED for reconsideration consistent herewith.

VACATED and REMANDED