United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 24, 2006**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-61180
_____

SENAIT KIDANE TESFAMICHAEL; DAWIT TESSEMA-DAMTE,

Petitioners,

versus

ALBERTO R. GONZALES, U.S. ATTORNEY GENERAL,

Respondent.

Petition for Review from
the Board of Immigration Appeals
A97-7476-471

Before JONES, Chief Judge, and WIENER and PRADO, Circuit Judges.

EDITH H. JONES, Chief Judge:

Petitioners seek review of the decision of the Board of Immigration Appeals ("BIA") denying them asylum, individually and as a married couple, from Eritrea and Ethiopia. Finding no reversible error, we DENY the petition for review.

**BACKGROUND**

Comprising Ethiopia, Eritrea, Somalia, and Sudan, the region known as the Horn of Africa has a troubled history. After World War II, Italy relinquished control of its African colonies, including Eritrea. In 1952, the United Nations federated Eritrea with Ethiopia. In the early 1960s, Ethiopia dissolved the federation and annexed Eritrea as a province. Factions in the

Eritrean province began clamoring for independence almost immediately and fought a brutal thirty-year war with the Ethiopian government. These factions later joined forces with Ethiopian groups seeking political reform to secure the overthrow of the Marxist regime of Mengistu Haile Mariam in 1991.

Once the Mengistu regime was overthrown, Ethiopian leaders permitted a national referendum on Eritrean independence in 1993. Registration to vote in the referendum was tied to verification of Eritrean nationality through a detailed form with information about a voter's religious affiliation, parents and grandparents, and references from three Eritrean citizens. More than one million voters, living in over forty different countries, selected independence by a huge majority. Eritrea, supported by the new Ethiopian government, declared independence in May 1993.

Relations between Ethiopia and its new neighbor proved cordial. After several years, however, border disputes led to war in May 1998. At the outbreak of war, the legal status of the approximately 75,000 voters in the Eritrean independence election who continued to live in Ethiopia remained uncertain, and in June 1998 Ethiopia began forcibly removing to Eritrea people who had voted in the election. The "deportations" occurred without due process. The deportees were often forced to stay in detention

2

camps briefly, and Ethiopia regularly scheduled the deportations piecemeal to break up families.[1]

Petitioner Senait Kidane Tesfamichael and her family were among those forcibly removed from Ethiopia. Senait's parents were originally from the Eritrean region, but Senait was born and lived in Addis Ababa, Ethiopia, until the deportations. At her asylum hearing, Senait testified credibly that she heard of the deportations in 1998 and feared removal. Shortly after the deportations began, Senait and her Ethiopian husband, Petitioner Dawit Tessema-Damte, attempted to escape out of Ethiopia, possibly to Kenya. Their escape plans were foiled, however. On a bus near the Kenyan border, police asked the passengers for identification. Senait could not produce any, as authorities had stripped her of her Ethiopian ID following her vote in the Eritrean referendum.[2] Dawit intervened on Senait's behalf, but his intervention led to both his and Senait's arrest and detention.

As he credibly testified, Dawit spent a month in jail for the purported crime of "smuggling Eritreans." Until his mother secured his release through a bond, he slept in one room with up to forty men, received little food, and saw other detainees with bruises caused, he believed, by beatings. While in jail, Dawit was

---

[1] This generalized background information comes from sources in the Administrative Record, which included, inter alia, country reports, a question and answer series prepared by the Department of State, and documents prepared by the UN Refugee Agency, the Human Rights Watch, and Amnesty International.

[2] Senait testified that in 1992, when she filled out the election card in the referendum, she became a citizen of Eritrea.

3

interrogated generally once or twice a day, for one or two hours, about how many people he had smuggled and how much he charged.

Dawit was able to secure Senait's release one week after his own by bribing officials. Back in Addis Ababa, Dawit was twice stopped by police; both times Dawit cooperated and was released. Fearing reprisal for his help to Senait, and without reporting to court on the pending smuggling charges, Dawit fled alone to Kenya, then South Africa, where he lived from 1998 to 2003.

Ethiopian authorities found Senait in June 2000 and removed her to Eritrea.[3] Senait testified that she spent three days in a detention center without food or water, then was forced to walk nine kilometers in an area filled with land mines on the way to Eritrea. There, Senait reconnected with her family and worked part-time at a gas station. She testified that she was occasionally taunted or told to go back to Ethiopia. She also claims that she was denied full Eritrean citizenship and an exit visa, and that she feared military conscription.

In 2002, two years after Senait had been removed to Eritrea, and after the war ended,[4] Dawit sent for her. Without an exit visa, Senait had to be smuggled out of Eritrea. She traveled through Sudan and Swaziland before reuniting with Dawit in South

---

[3]  Senait was the last of her family to be removed from Ethiopia. At various times in 1998 and 1999, members of Senait's family were taken by Ethiopian police, harassed, and sent to Eritrea.

[4]  Ethiopia and Eritrea negotiated a peace settlement in December 2000.

4

Africa. There, the couple stayed for a year until they were robbed and burglarized, crimes which scared Senait, and they decided to leave. After traveling through Cuba, Nicaragua, Guatemala, and Mexico, the couple arrived in the United States in March 2004.

Senait and Dawit entered the United States without visas, and they conceded removability pursuant to 8 U.S.C. § 1182(a)(6)(A)(I). An Immigration Judge ("IJ") found them ineligible for asylum, withholding of deportation, and relief under the Convention against Torture ("CAT"). A single judge of the BIA affirmed.

## DISCUSSION

The Ethiopian-Eritrean conflict precipitated a rash of asylum seekers entering the United States.[5] Although Petitioners are sympathetic victims of this conflict, the BIA and this court must analyze their claims statutorily. If petitioners do not qualify for asylum, the BIA correctly rejected their claims.[6]

This court reviews the BIA's legal conclusions de novo. Girma v. I.N.S, 283 F.3d 664, 666 (5th Cir. 2002); Lopez-Gomez v. Ashcroft, 263 F.3d 442, 444 (5th Cir. 2001). We will defer to the BIA's interpretation of immigration regulations if the interpreta-

---

[5]    See, e.g., Giday v. Gonzales, 434 F.3d 543 (7th Cir. 2006); Haile v. Gonzales, 421 F.3d 493 (7th Cir. 2005); Negeya v. Gonzales, 417 F.3d 78 (1st Cir. 2005); Fessehaye v. Gonzales, 414 F.3d 746 (7th Cir. 2005); Nuru v. Gonzales, 404 F.3d 1207 (9th Cir. 2005); Begna v. Ashcroft, 392 F.3d 301 (8th Cir. 2004); Tsegay v. Ashcroft, 386 F.3d 1347 (10th Cir. 2004); Tolosa v. Ashcroft, 384 F.3d 906 (7th Cir. 2004).

[6]    Petitioners do not here challenge the denial of their claims for withholding or CAT relief.

tion is reasonable. <u>Lopez-Gomez</u>, 263 F.3d at 444. The BIA's factual findings are upheld if supported by substantial evidence, <u>Long v. Gonzales</u>, 420 F.3d 516, 519 (5th Cir. 2005), that is, unless the evidence is so compelling that no reasonable factfinder could fail to find otherwise. <u>Id.</u>

To qualify for asylum, an alien must be a "refugee." <u>See</u> 8 C.F.R. § 1208.13(a). The Immigration and Naturalization Act defines a refugee as a person unable to return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Past persecution entails harm inflicted on the alien on account of a statutorily enumerated ground by the government or forces that a government is unable or unwilling to control. 8 C.F.R. § 1208.13(b)(1). The alternative asylum ground, a well-founded fear of persecution, results when a reasonable person in the same circumstances would fear persecution if deported. <u>Jukic v. INS</u>, 40 F.3d 747, 749 (5th Cir. 1994).

In either case, to establish persecution, the alien's "harm or suffering need not be physical, but may take other forms, such as the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life." <u>Abdel-Masieh v. INS</u>, 73 F.3d 579, 583 (5th Cir. 1996) (quoting <u>Matter of Laipenieks</u>, 18 I & N Dec. 433, 456-457 (BIA 1983) (citations omitted)). Nevertheless,

6

> [i]t does not encompass all treatment that our society regards as unfair, unjust or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country — and it seems most unlikely that Congress intended such a result.

Majd v. Gonzales, 446 F.3d 590, 595(5th Cir. 2006) (quoting Al-Fara v. Gonzales, 404 F.3d 733, 739 (3d Cir. 2005)).

The Petitioners each bring an individual claim for asylum. Additionally, they bring a claim for asylum on the basis that they will be separated if removed to their respective countries. If we find error in the BIA's decision in resolving any of the claims, we must remand, as Senait and Dawit would have derivative claims for relief based on their marriage.[7]

## A.    Senait's Claim

The BIA held that Senait was (1) a citizen of Eritrea, (2) firmly resettled in Eritrea, and (3) unable to show past persecution or a well-founded fear of persecution if returned to Eritrea.

Senait takes issue with this reasoning and would have us consider her a refugee from Ethiopia based on Ethiopia's forced deportation policy, which sent her to Eritrea. This claim falters under the facts and the plain language of the statute. As was just noted, aliens who seek asylum must meet the definition of a

---

[7] Although the IJ found that Petitioners did not establish that they were married, the BIA did not make a finding as to the issue of their marriage, instead assuming for purposes of analysis that the couple was married under Ethiopian law. We do the same.

"refugee." See 8 U.S.C. § 1208.13(a); see also Eduard v. Ashcroft, 379 F.3d 182, 187 (5th Cir. 2004).  The statute defines a refugee as including:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A) (emphasis added).  The statute thus permits an alien to seek asylum from only one "test country":  that of the alien's nationality, or, if the alien is stateless, that of the country where the alien last habitually resided.  Cf. Wangchuck v. Dep't of Homeland Sec., 448 F.3d 524, 529 (2d Cir. 2006) (noting the error in the BIA's assumption that an alien could be eligible for asylum based on a well-founded fear of persecution in either of two countries).  In Senait's case, the BIA adjudicated her asylum claim with reference to Eritrea.  If the BIA's decision to use Eritrea as Senait's test country is supported by substantial evidence, any persecution that Senait allegedly faced in Ethiopia is irrelevant under the statute.

A "national" is "a person owing permanent allegiance to a state."  8 U.S.C. § 1101(a)(21).  Senait has never argued that she is still an Ethiopian national, as she was divested of Ethiopian citizenship.  Moreover, in her asylum application, Senait filled in Eritrea as her "Presented Nationality (Citizenship)."

8

"Nationality is a status conferred by a state."  Dhoumo v. BIA, 416 F.3d 172, 175 (2d Cir. 2005); cf. Paripovic v. Gonzales, 418 F.3d 240 (3d Cir. 2005) (petitioner was rendered stateless by the dissolution of the former Yugoslavia).  The BIA's implicit reliance on Senait's concession that she is not an Ethiopian national is hard to criticize.[8]

The BIA found that Senait was a citizen of Eritrea and firmly resettled there.[9] Senait argues that she could not have been firmly resettled in Eritrea because, as an Ethiopian deportee, she was not granted the same rights as non-refugee Eritreans.  Yet the only thing this argument can do is force Senait's asylum claim into the statelessness rubric:  If Senait is a national of Eritrea, her asylum claim must be decided through Eritrea.  If Senait is not a

---

[8]    In supplemental briefing, Petitioners cited two recent Seventh Circuit decisions dealing with refugees from Ethiopia and Eritrea, Giday v. Gonzales, 434 F.3d 543 (7th Cir. 2006), and Haile v. Gonzales, 421 F.3d 493 (7th Cir. 2005).  Were this court to follow it, the Seventh Circuit's decision in Haile, noting that it is arguable that "a program of denationalization and deportation is in fact a particularly acute form of persecution," id. at 496, would be persuasive evidence that Senait suffered persecution in Ethiopia.  Yet that is not the relevant question here:  Both petitioners in Haile could use Ethiopia as their test country, whereas the BIA found that Senait could not. Neither of the petitioners in Haile had actually been deported from Ethiopia, id. at 495, and the court remanded in part so the IJ could determine "whether the petitioners are still considered citizens by Ethiopia," id. at 496.
    Giday is similarly distinguishable:  The petitioner in Giday lived in Eritrea but was ethnically Ethiopian;  Eritrea attempted to deport the petitioner because of her Ethiopian heritage.  Eritrea remained the test country because she had never been to Ethiopia and was not a national there, and because once she escaped Eritrea, the petitioner left for the United States immediately.  Id. at 547.

[9]    8 U.S.C. § 1158(b)(2)(A)(vi) provides that the Attorney General may not grant asylum to an otherwise eligible refugee if "the alien was firmly resettled in another country prior to arriving in the United States."  An alien is firmly resettled if "he or she entered into another country with, or while in that country received, an offer of . . . citizenship . . . ."  8 C.F.R. § 208.15.

9

national of Eritrea, her asylum claims must be decided through the country where she last habitually resided. That country turns out also to be Eritrea.

By finding that Senait was firmly resettled in Eritrea, the BIA implicitly found that Senait's last habitual residency was Eritrea, or, in any event, not Ethiopia. Cf. Al Najjar v. Ashcroft, 257 F.3d 1262, 1294 (11th Cir. 2001) (approving an implicit finding of "last habitual residence"). Substantial evidence supports such a finding under any plausible definition of last habitual residence.[10]

The immigration law defines "residence" as "the place of general abode," which is a person's "principal, actual dwelling in fact, without regard to intent." 8 U.S.C. § 1101(a)(33). Senait has not lived in Ethiopia since June 2000, and she did not arrive in the United States until March 2004. For more than two years, she lived in Eritrea with her mother, some of her siblings, and, while he was alive, her father. She also was employed as a gas station cashier with Mobil Oil. After living in Eritrea, Senait lived briefly in South Africa with Dawit, but they chose to move away from there.

---

[10] The meaning of "last habitual residence" is a question of law reviewed de novo, with agency deference when appropriate. Paripovic, 418 F.3d at 243. Like the BIA, we need not, and do not, determine the precise contours of the meaning of "last habitual residence." Under any plausible definition of the term, Senait had not last habitually resided in Ethiopia. It is that factual determination that we review for substantial evidence. See Al Najjar, 257 F.3d at 1294.

Significantly, Senait's asylum application indicates that she perceived Eritrea to be her test country. The form asks: "Please list your last address where you lived before coming to the U.S. If this is not the country where you fear persecution, also list the last address in the country where you fear persecution." (Emphasis added). Senait furnished addresses in South Africa and Eritrea; she omitted Ethiopia. Further, when asked if she feared harm if returned to her "home country," she responded by invoking hardships in Eritrea, not Ethiopia.

These facts belie any notion that Ethiopia is Senait's last habitual residence; the BIA's determination to use Eritrea as her test country is supported by substantial evidence.

Senait next challenges the BIA's decision that she did not suffer past persecution and lacks a reasonable fear of future persecution in Eritrea.[11] Senait argues that (1) the Eritrean government regularly commits human rights violations; (2) the Eritrean government required Senait, unlike "native Eritreans," to carry a card that identified her as an Ethiopian refugee; (3) she was denied an exit visa; (4) she has a "vulnerable social status" as an Ethiopian refugee; and (5) she was "harassed and discriminated against by the Eritrean government." On these

---

[11] Technically, the petitioners do not argue that Senait suffered persecution in Eritrea, instead attacking only the BIA's finding that Senait was firmly resettled in Eritrea. We will read their briefs liberally, however, and construe their arguments against firm resettlement as arguments that Senait suffered and fears persecution in Eritrea.

11

points, the BIA explained that Senait's only individualized complaint was "that customers at the gas station where she worked made remarks threatening that those born in Ethiopia should be sent back there," and that "[t]hese incidents and alleged discrimination against Eritreans from Ethiopia fall short of persecution." Further, the BIA noted that there was "no evidence" that Senait "was treated differently than native-born Eritreans by the government."

The BIA's decision is supported by substantial evidence. Senait's fears fall far short of the required "extreme conduct" needed to establish persecution. Her only complaint of individualized harassment stemmed from a few incidents where she was taunted at work. Persecution cannot be based on "mere denigration, harassment, and threats." Eduard v. Ashcroft, 379 F.3d 182, 188 (5th Cir. 2004); see also id. at 187 n.4 (persecution "requires more than a few isolated incidents of verbal harassment or intimidation" (quoting Mikhailevitch v. INS, 146 F.3d 384, 390 (6th Cir. 1998))). Petitioners also point to their expert's affidavit that Eritreans from Ethiopia are treated "harshly," are "unduly discriminated against," and are blamed for hardships. As the expert conceded, however, many Eritrean problems "are undoubtedly effects of the economic hardships caused by the war overall." Eduard holds that "[n]either discrimination nor harassment ordinarily amounts to persecution under the INA, even if the conduct amounts to 'morally reprehensible' discrimination on the basis of race or religion." Id. at 188. Finally, the fact that

12

Eritrea denied Senait an exit visa does not on this record establish persecution.[12]  The totality of the evidence does not compel a conclusion contrary to that of the BIA.

**B.  Dawit's Claim**

Dawit's asylum claim is premised on his arrest, detention, and charge for violating Ethiopia's travel laws by "smuggling Eritreans."  These acts, he asserts, amounted to past persecution on account of his social group and imputed political opinions.  In providing parameters for the term "persecution," the BIA has stated:

> While punishment of criminal conduct in itself is not persecution, where that punishment entails such things as severe beatings or being sent to a Nazi concentration camp — i.e., is 'excessive or arbitrary' — and is motivated by one of the specified grounds, such punishment would constitute persecution under [immigration laws].

Abdel-Masieh, 73 F.3d at 584 (quoting Laipenieks, 18 I & N Dec. at 456-457).  In this case, the BIA held that Dawit's punishment "would be prosecution for a criminal act, not persecution."

Based on the record, substantial evidence supports the BIA determination that Dawit did not experience past persecution. Dawit encountered Ethiopian law enforcement three times. First, he was arrested and detained for a month when he and Senait were stopped at the Kenyan border near the beginning of the Ethiopian-

---

[12]      Senait testified that, in 2002 when she wanted to leave Eritrea, the Eritrean government denied exit visas to everyone between the ages of eighteen and forty.

Eritrean border war, and he was charged with smuggling. The detention was under unpleasant and unduly prolonged but not brutal conditions. Later, he was stopped twice in Addis Ababa and his bag was searched. On neither of these latter occasions, however, could Dawit affirm whether the police were aware of the pending criminal charges or were conducting planned surveillance on him.

Not only do these law enforcement encounters fail to rise to the level of physical persecution, compare Abdel-Masieh, 73 F.3d at 584, but it is also unclear whether they were motivated by political or social group animus against Dawit. There is no explanation in the record for his being accosted in Addis Ababa. And as to the smuggling charge, when two countries are at war, it is not invariably persecution for each sovereign to control the travel of persons it believes may harbor sympathy for the enemy or who might flee the country to fight on the other side. The background of Dawit's detention, of course, is the forced deportations and denationalization that both Ethiopia and Eritrea carried out against their resident ethnic minority and that other courts have asked the BIA to evaluate for asylum purposes. See Haile, 421 F.3d at 494-95. Still, there is no direct connection between his criminal charge and the "ethnic cleansing," while there is an obvious purpose in a country's enforcement of passport and travel laws during wartime.

Dawit argues that he was singled out for prosecution because, when he identified himself as Senait's husband, the

14

authorities "knew his political opinions" and sought to punish him as a sympathizer with Eritreans. These connections are inferences that the BIA was not required to draw. Dawit's interrogation over the course of his detention seems, on the contrary, to have concerned mundane attributes of smuggling — how many people, how much money — rather than political inquisition.

This court recently held that "[a]sylum protects victims of persecution on account of belief, not conduct." Mwembie v. Gonzales, 443 F.3d 405, 414 (5th Cir. 2006) (citing cases). The line separating belief from conduct may not always be clearly delineated when based on the existence of criminal charges, but here we are not persuaded that Dawit was persecuted on account of his beliefs or his marriage to an Eritrean.

It follows that, because Dawit's main expressed fear in returning to Ethiopia is his exposure to the outstanding criminal charge, and that charge is not sufficient to show persecution, he has not established a well-founded fear of future persecution. Further, Dawit does not take issue in his appellate brief with the BIA's observation that it is unclear whether he would face further criminal proceedings on return to Ethiopia for events that happened eight years ago. Dawit has not demonstrated that the evidence he offered "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." INS v. Elias-Zacarias, 502 U.S. 478, 484-85, 112 S. Ct. 812, 817 (1992).

15

## C.    The Spousal Separation Claim

Senait and Dawit assert that they are entitled to asylum as a married couple for the persecution they will suffer on account of their membership in a protected social group, that of inter-ethnic married couples.  The "persecution" they claim is forced separation, to wit, that Senait cannot live with Dawit in Ethiopia and Dawit allegedly cannot live with Senait in Eritrea.  The Board dismissed this claim of persecution, stating that "[t]he cases cited by the respondents regarding the consideration of spousal separation are not relevant to this case.  Not every action we would regard as unjust or unlawful amounts to persecution."

The Board's conclusion is correct.  There is no legal authority that compels asylum for married couples where deportation could separate them, and the Board found that Senait and Dawit had not in any event proven removal would cause them to be separated.  As they did before the Board, Petitioners rely on three cases to support their contention that spousal separation is persecution.  See Kalubi v. Ashcroft, 364 F.3d 1134, 1141 (9th Cir. 2004);  Ma v. Ashcroft, 361 F.3d 553, 561 (9th Cir. 2004); Carrete-Michel v. INS, 749 F.2d 490, 494 (8th Cir. 1984).  We agree with the Board that they are all distinguishable.  Kalubi dealt with discretionary entitlement, as opposed to legal eligibility, for asylum.  See 8 U.S.C. § 1158(b)(1)(A) ("Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for

16

asylum."); <u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421, 444, 107 S. Ct. 1207, 1219 (1987) (stating that aliens who "can only show a well-founded fear of persecution are not <u>entitled</u> to anything, but are <u>eligible</u> for the discretionary relief of asylum"). The BIA denied Kalubi asylum on discretionary grounds because it believed he lacked credibility. The Ninth Circuit reversed, holding, <u>inter alia</u>, that if an alien is credible for purposes of eligibility, he cannot be held incredible for purposes of discretionary entitlement. <u>Kalubi</u>, 364 F.3d at 1138-39. Also, construing a pertinent regulation, the Ninth Circuit held only that spousal separation is a factor the BIA must consider once it deems an alien eligible for asylum; the court did not hold that spousal separation is related to eligibility.

Similarly, <u>Carrete-Michel</u> did not deal with eligibility for asylum, but instead involved a Mexican national who sought suspension of deportation by demonstrating extreme hardship, through his longstanding ties to the United States and the separation he would face from his family. <u>Carrete-Michel</u>, 749 F.2d at 492. This finding compelled the Attorney General to suspend deportation under pre-IIRIRA law. <u>Id.</u>; <u>see also</u> 8 U.S.C. § 1254(a)(1) (repealed).[13] <u>Carrete-Michel</u> reflects a longstanding

---

[13] After IIRIRA, an alien can establish cancellation of removal, effectively the same thing as suspension of deportation, with ten years continuous physical presence in the United States, good moral character, lack of certain convictions, and a showing that "removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child" who is a citizen or lawful permanent resident of the United States. <u>See</u> 8 U.S.C. § 1229b(b).

immigration policy of favoring aliens who have ties to United States citizens or lawful permanent residents ("LPR"), see 8 U.S.C. § 1153(a). This policy is entirely distinct from the definition of persecution under other immigration provisions.

Finally, petitioners rely on Ma v. Ashcroft, a case involving a husband's asylum claim based on his wife's forced abortion in China. For this particularized form of persecution, Congress has specifically provided a remedy in 8 U.S.C. § 1101(a)(42)(B). That a wife's forced sterilization is persecution to the husband under this law, Matter of C-Y-Z, 21 I. & N. Dec. 915, 917-18 (BIA 1997), does not mean that a country persecutes a husband by forbidding his wife to live with him in that country.

Although the United States supports marriage and family reunification, it does not follow that because two aliens may not be able to live together in their home countries, they are persecuted. This country denies entry to some foreign nationals who marry a United States citizen, see 8 U.S.C. § 1182, and allows the removal of the spouse of a U.S. citizen or LPR under certain conditions, see 8 U.S.C. § 1227. While the BIA may determine that spousal separation, in appropriate circumstances, constitutes persecution, it did not so find here.

The Board found, and the record fully supports, that Dawit could not have been "persecuted" by his wife's expulsion to Eritrea, as he was by that time living in South Africa, had not

18

officially registered their marriage, and was not connected to the expulsion. The Board also found that the couple have not proven their inability to live together in Eritrea. The Board cited in support of this finding three facts: (1) Dawit and Senait never inquired officially about the possibility of returning there together; (2) the expert's affidavit "only indicates that there is much resentment against Ethiopians in Eritrea"; and (3) Dawit would have trouble finding employment. The first and third findings are unassailable. The second finding understates the appellants' expert's affidavit, which goes to some length detailing the discrimination that might befall both Senait and Dawit in Eritrea due to lingering prejudice against their ethnically mixed marriage. But predictions of possibilities do not support a well-founded fear of persecution, nor, as we have noted, does discrimination alone amount to persecution. Petitioners have not demonstrated that the Board's findings must be overturned.

## CONCLUSION

For the foregoing reasons, the petition for review of the Board's decision is **DENIED**.