# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-60604

United States Court of Appeals
Fifth Circuit

**FILED**

December 30, 2019

Lyle W. Cayce
Clerk

MIKAILU JALLOH, also known as Mikailou Diallo,

    Petitioner

v.

WILLIAM P. BARR, U. S. ATTORNEY GENERAL,

    Respondent

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A209 991 615

Before KING, JONES, and DENNIS, Circuit Judges.

PER CURIAM:*

The petitioner in this case fled his home country after receiving death threats for writing a newspaper article calling for the abolition of female genital mutilation. An immigration judge and the Board of Immigration Appeals rejected his request for asylum, ruling that his opposition to female genital mutilation did not qualify as a political opinion and failing to analyze his argument that he had a well-founded fear of future persecution. Because

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-60604

this was error, we grant the petition in part and remand the case for further proceedings.

## I.

## A.

Petitioner Mikailu Jalloh is a citizen of Sierra Leone who is seeking asylum in the United States. Jalloh fled Sierra Leone after a conflict with the Bondo, also known as the Sande, a powerful secret society in Sierra Leone that supports, perpetuates, and sometimes forcibly imposes female genital mutilation. The vast majority of women in Sierra Leone have experienced some form of genital mutilation.

In October 2016, Jalloh's girlfriend told him that the Bondo intended, against her will, to mutilate her. Jalloh, who occasionally wrote articles for a local newspaper, decided to investigate the Bondo and to write an article about them. In November 2016, after Jalloh had been conducting interviews about female genital mutilation, five members of the Bondo showed up at his house at dusk. They blamed Jalloh for his girlfriend's aversion to them, and they threatened to kill him if he continued to interfere. Jalloh replied that he intended to expose them.

Jalloh's article about female genital mutilation and the Bondo was published in December 2016. The article, which ran under the headline "Abolish Female Genital Mutilation Now & Save Our Girls," called on the "government to pass laws that totally abolish the practice in Sierra Leone." The following week, a group of Bondo supporters carrying sticks and rocks came at night to Jalloh's house and threatened to burn it down if he did not emerge. After Jalloh's sister-in-law told the mob that Jalloh was not at home, they searched the house and, not finding him, told her that Jalloh was "a walking dead man." Jalloh's sister-in-law called Jalloh and informed him of what had transpired, and Jalloh immediately fled.

2

No. 18-60604

**B.**

On January 17, 2017, Jalloh presented himself at the border in Laredo, Texas, and requested asylum. He was placed into removal proceedings, where he argued that he was eligible for asylum and withholding of removal. The immigration judge disagreed. Although crediting Jalloh's testimony, the immigration judge ruled that "[t]he threats made to [Jalloh] were criminal and not equivalent to persecution on account of a political belief. The motive of the perpetrators has nothing to do with [Jalloh]'s politics, but was retaliatory because of interference with a cultural practice." The immigration judge also noted that "[t]he government [of Sierra Leone] has taken no action against [Jalloh]."

The Board of Immigration Appeals affirmed and adopted the immigration judge's decision. The board agreed that Jalloh was threatened "because he was critical of a cultural practice" and not because of "his political opinion." The board further determined that "the threats [Jalloh] received" were "insufficient to establish past persecution." Finally, the board agreed with the immigration judge that "the government has not sought to harm [Jalloh] due to his activities as a journalist." The board thus ruled that Jalloh was not eligible for asylum and that, *a fortiori*, he was not eligible for withholding of removal. Jalloh timely filed a petition for review.

**II.**

Asylum may be granted to those who are "'unwilling to return to' their home country 'because of persecution or a well-founded fear of persecution'" based on "race, religion, nationality, membership in a particular social group, or political opinion." *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 348 (5th Cir. 2006). Jalloh argues that he qualifies because he faced persecution by the Bondo in Sierra Leone and reasonably fears persecution if he returns due to his political opinion: namely, his opposition to female genital mutilation. The

No. 18-60604

Attorney General denies that the threats that Jalloh received amounted to persecution but otherwise concedes that the Board of Immigration Appeals erred and argues that the case should be remanded.

**A.**

"A political opinion is 'one that is expressed through political activities or through some sort of speech in the political arena,'" such as by "[c]ampaigning against the government, writing op-ed pieces, urging voters to oust corrupt officials, . . . or speaking out repeatedly as a 'public gadfly.'" *Liu v. Holder*, 692 F.3d 848, 852 (7th Cir. 2012) (citation omitted). "Criticism of government actions or policies generally may be considered the expression of political opinion." *Li v. Holder*, 559 F.3d 1096, 1111 (9th Cir. 2009). In this case, Jalloh wrote a newspaper article calling on his government to "take Action Now," stating that "[p]oliticians have refused to talk about [female genital mutilation] for fear of losing votes while the Government who declared a ban on the practice has failed to take actions against perpetrators." In the article, Jalloh complained that "governments after governments have failed to put relevant mechanism[s] in place to save young girls" from mutilation and urged the "government to pass laws that totally abolish the practice in Sierra Leone." This is quintessentially political speech, and the Attorney General does not argue otherwise.[1]

Because of Jalloh's article, a mob came to his house and threatened his life. Jalloh's political opinion was thus a central reason for the persecution that he claims. The immigration judge's conclusion—which the Board of Immigration Appeals affirmed—that the threats against Jalloh had "nothing to do with [his] politics" is unsupportable and constituted error.

---

[1] The Attorney General instead speculates that the board must have overlooked "the portions of [the one-page] article in which [Jalloh] criticized the government of Sierra Leone and advocated for the government to abolish [female genital mutilation]."

No. 18-60604

## B.

Establishing that he was threatened based on his political opinion gets Jalloh only part of the way there. He must also prove that those threats amounted to "past persecution" or gave rise to "a well-founded fear of future persecution." *Cabrera v. Sessions*, 890 F.3d 153, 159 (5th Cir. 2018).

Persecution can take many forms and "need not be physical." *Morales v. Sessions*, 860 F.3d 812, 816 (5th Cir. 2017) (quoting *Abdel-Masieh v. INS*, 73 F.3d 579, 583 (5th Cir. 1996)). We have said that persecution includes not only "threats to life, confinement, [and] torture," *id.* (citation omitted), but also "the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life," *Tesfamichael v. Gonzales*, 469 F.3d 109, 114 (5th Cir. 2006) (quoting *Abdel-Masieh*, 73 F.3d at 583). Nevertheless, to qualify as persecution, conduct must be "extreme," *Morales*, 860 F.3d at 816 (quoting *Tesfamichael*, 469 F.3d at 116); "persecution generally 'requires more than a few isolated incidents of verbal harassment or intimidation,'" *id.* (citation omitted). What is more, to trigger eligibility for asylum, the persecution must have been inflicted "by the government or forces that [the] government is unable or unwilling to control." *Tesfamichael*, 469 F.3d at 113.

Because the Board of Immigration Appeals adopted the immigration judge's ruling, we review both the board's and the immigration judge's decisions. *See Sealed Petitioner v. Sealed Respondent*, 829 F.3d 379, 383 (5th Cir. 2016). "We review the legal conclusions of the IJ and the BIA de novo, and we review their factual findings for substantial evidence." *Id.* Whether particular conduct amounts to persecution "is a question of law that we review de novo." *Morales*, 860 F.3d at 816.

Here, the board determined that the two threats made against Jalloh did not constitute past persecution because they were insufficiently severe. But as

5

to Jalloh's fear of future persecution, the board found only (1) that it was unconnected to a political opinion and (2) that "the government has not sought to harm [Jalloh] due to his activities as a journalist." For the reasons already mentioned, this first finding was erroneous.

The second finding—that the *government* of Sierra Leone was unlikely to persecute Jalloh—misapprehends Jalloh's concern. Jalloh's asylum application stated that he feared that if he returned to Sierra Leone, he would "be killed by the Bondo people." And he presented considerable evidence that the Sierra Leonean government was either unable or unwilling to stop the Bondo. Among other incidents, the record reveals that, on one occasion, the Bondo marched four journalists through the streets naked because they had reported negatively on female genital mutilation. On another occasion, the police did arrest one of the Bondo for kidnapping a woman and cutting her genitals, but hundreds of Bondo supporters descended on the police station and successfully demanded the arrestee's release. Jalloh also testified that a preacher had recently been burned alive for opposing the Bondo.

The Board of Immigration Appeals failed to analyze whether Jalloh's fear of persecution by the Bondo was well founded, or whether the government of Sierra Leone was unable or unwilling to control the Bondo. When the board fails to address a key issue, remand is generally the "proper course" of action. *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). Jalloh argues that we need not remand on this issue because the evidence in the record is overwhelming. But "[w]here an agency has failed to comply with its responsibilities, we should insist on its compliance rather than attempt to supplement its efforts." *Abdel-Masieh*, 73 F.3d at 585 (quoting *Sanon v. INS*, 52 F.3d 648, 652 (7th Cir. 1995)). Although it is sometimes appropriate for this court to decide such an issue in the first instance, such occasions are "rare," *Orlando Ventura,* 537 U.S. at 16 (quoting

*Fla. Power*, 470 U.S. at 744), and we see no special reason to do so here.[2] Accordingly, we remand this case to the Board of Immigration Appeals for a decision on Jalloh's asylum eligibility that properly considers his fear of future persecution by the Bondo.

## III.

Jalloh also seeks withholding of removal. This requires him to show that "there is a clear probability that [his] life or freedom w[ould] be threatened based upon [his] . . . political opinion" were he returned to Sierra Leone. *Morales*, 860 F.3d at 817. Because this standard is "higher than the standard for asylum, . . . the failure to establish a well-founded fear for asylum eligibility also forecloses eligibility for withholding of removal." *Orellana-Monson v. Holder*, 685 F.3d 511, 518 (5th Cir. 2012). Once the Board of Immigration Appeals determined that Jalloh was ineligible for asylum, it summarily concluded that he was also ineligible for withholding of removal. Because the board must reassess Jalloh's asylum request, so too must it reassess whether he is eligible for withholding of removal. *See Mikhael v. INS*, 115 F.3d 299, 306 (5th Cir. 1997).

## IV.

For the foregoing reasons, the petition is GRANTED in part, and the case is REMANDED to the Board of Immigration Appeals for further proceedings consistent with this opinion.

---

[2] Jalloh originally argued that remand would unnecessarily prolong his stay in immigration detention. At oral argument, however, counsel for the Attorney General represented that Jalloh is no longer in custody.