# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 25, 2023

Lyle W. Cayce
Clerk

No. 20-60133

Darlin Maribel Reyes-Hoyes; Antony Josue Hernandez-Reyes,

*Petitioners*,

*versus*

Merrick Garland, U.S. Attorney General,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A208 981 842
BIA No. A208 981 844

Before Dennis and Higginson, *Circuit Judges*.[†]

Per Curiam:[*]

Darlin Maribel Reyes-Hoyes ("Reyes-Hoyes") and her minor child Antony Josue Hernandez-Reyes ("Antony") petitioned this court to review the denial of their applications for asylum. For the following reasons, the petition for review is GRANTED in part and DISMISSED in part. The

---

[†] This appeal is being decided by a quorum. 28 U.S.C. § 46(d).

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 20-60133

decision of the Board of Immigration Appeals ("BIA") is VACATED, and the case is REMANDED to the BIA for further proceedings.

## I. Background

Reyes-Hoyes and Antony are natives and citizens of Guatemala. They entered the United States without inspection on May 2, 2016. Reyes-Hoyes conceded removability and applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Antony was listed as a derivative on the application. Reyes-Hoyes briefly explained in her application that her common-law husband, Federico Alfonso Hernandez Barrios ("Federico"), was a political candidate who was shot and killed during his campaign for mayor of their town, Pajapita, and that she feared she would be killed as well if she returned to Guatemala either on account of her political opinion or because of her membership in the particular social group ("PSG") comprised of "Family Members" or "Domestic Partners of Politicians in Guatemala running for office within the Government."

In support of the application, Reyes-Hoyes submitted numerous documents, including:

- A death certificate showing that Federico was killed by a gunshot wound on November 10, 2010;
- An affidavit from Reyes-Hoyes explaining that she and Federico lived together in a common-law marriage prior to Federico's murder;
- Affidavits from (1) Reyes-Hoyes's neighbor in Pajapita, (2) the minister of her church, and (3) the Deputy Secretary of El Torito Civic Committee, the political party to which Federico belonged, all stating that Federico was murdered for political reasons and that Reyes-Hoyes received threats, including death threats; and
- An affidavit from Reyes-Hoyes's older son Kevin, attesting that his father was murdered in November 2010; that his family thereafter left Pajapita because they lacked protection and were afraid; and that his

No. 20-60133

family was immediately threatened and beaten upon returning to Pajapita in January 2016.

Reyes-Hoyes also submitted country condition evidence, including:

- The State Department's Guatemala 2016 Human Rights Report and Amnesty International's 2017/2018 Report, both of which discuss corruption among the police and judiciary;

- Various newspaper articles reporting on corruption, organized crime, and political violence directed against candidates and activists, including the murder of local candidates;

- Newspaper articles reporting on drug trafficking and anti-drug police activity; and

- Newspaper articles reporting on the assassinations of politicians, including mayors and mayoral candidates, as well as death threats and attacks directed at their families.

At a hearing held on April 5, 2018, Reyes-Hoyes testified in support of her application. She stated that she and Federico had three children, an older son and daughter—twins Kevin and Fanny—and a younger son, Antony. Federico belonged to the El Torito political party and ran for mayor of the town of Pajapita in 2010; Reyes-Hoyes helped him and campaigned alongside him. During the last two weeks of Federico's life, he received threatening voicemail and text messages stating that he should end his mayoral campaign. Two weeks after the threats began, Federico was shot and killed.

Reyes-Hoyes testified that she went to the police after Federico's murder and told them that she recognized the voice on one of the threatening voice messages as belonging to Marvin DeLeon, the son of a rival candidate for mayor, Isidro DeLeon. Based on the messages, Reyes-Hoyes told police that she believed the DeLeons were responsible for Federico's murder. A policeman named "Polito" told her "you better leave the things the way they

are if you don't want the same thing that happened to your husband to happen to you." El Torito members asked Reyes-Hoyes to take Federico's place as a party leader, but she declined. Isidro DeLeon won the mayoral election that year.

Reyes-Hoyes testified that, after she made her complaint to the police, she began to receive threatening text messages and letters telling her to "leave the things as they were" and "stop doing everything." People passed by her house and shot guns into the air. Later, Marvin DeLeon and another man attempted to kidnap Reyes-Hoyes's daughter outside of her school. Other girls and their mothers intervened and prevented the kidnapping. Reyes-Hoyes did not report the attempted kidnapping to the police because she thought it would be futile— "I already reported the first time and I didn't receive any support"—or would make things worse. She testified that "I think the biggest mistake that I made was to go to the police to make a complaint" because "after I made the complaint to the police the threats began."

Reyes-Hoyes testified that, following the attempted kidnapping, she and her three children moved away to another town, Mesata, because she was afraid to stay in Pajapita. She testified that she lived in Mesata without harm for two years. Then, two of Isidro DeLeon's sons appeared in the market in Mesata where Reyes-Hoyes worked selling clothes. When they saw Reyes-Hoyes, they approached her, threw her merchandise on the ground, and beat her, cursing and calling her a "wicked bitch." After the attack, Reyes-Hoyes and her children moved to another town, Raul, because she feared she would be found and harmed again if she stayed in Mesata. Reyes-Hoyes testified that her family lived unmolested in Raul for a little less than two years. Reyes-Hoyes then spotted Marvin DeLeon in Raul but was unsure if his presence was coincidental or not. She decided to move her family again, to Guatemala City, where she and her children lived with her brother-in-law, but because

was not adequate space or other housing available for her and her three children, they did not stay for long.

Reyes-Hoyes testified that, in January 2016, Reyes-Hoyes moved back to her unoccupied house in Pajapita, hoping that the danger had passed. But the same day that Reyes-Hoyes returned home, the DeLeon sons came and attacked her. She was beaten in the presence of her children, and her older son Kevin had a pistol pointed at his head. The next day, she went to Mexico with all three of her children, where they stayed for three months. Reyes-Hoyes and her youngest child, Antony, then came to the United States.

Reyes-Hoyes testified that the DeLeon family was affiliated with a gang, Los Pupas, that operated in Pajapita, and that Marvin DeLeon frequently went to San Marcos and Chilla because the gang "would move to those places." In January of 2017, after Reyes-Hoyes came to the United States, one of the DeLeon sons, Guillermo, was shot and killed in a confrontation with Guatemalan police during a nationwide series of drug raids when he attacked an officer with a machete. By then, Isidro DeLeon was no longer the mayor.

The IJ denied Reyes-Hoyes's application on April 6, 2018. IJ expressed some doubts about Reyes-Hoyes's credibility, although he did not explicitly find her uncredible, and ultimately the IJ stated he was not denying relief "based on a lack of sufficiency of proof." Without elaboration, the IJ stated that the harm Reyes-Hoyes had suffered in the past did not rise to the level of persecution. The IJ also concluded that Reyes-Hoyes did not have a well-founded fear of future persecution because she had not carried her burden of showing that relocation within Guatemala was unreasonable. The IJ characterized the DeLeons as part of "a criminal organization involved in drugs," murder, and other activities, a "gang" referred to as "Los Pupas" that operates in three towns, "[Pajapita] and also San Marcos and Chala."

No. 20-60133

The IJ stated that Reyes-Hoyes had been able to successfully relocate to Mesata and Raul, and that she could avoid harm within Guatemala because Los Pupas only operated in three towns.

The IJ also found Reyes-Hoyes did not show that any persecution was inflicted by the government or by private parties that the government is unable or unwilling to control. The IJ said that the DeLeons were part of a criminal gang; that Reyes-Hoyes did not report many of the attacks to the police; that the police did investigate Federico's death and that Polito's statement to "leave things as they are" could have been a "legitimate warning" or a "friendly warning," rather than a threat; and that five years later Guillermo DeLeon had been killed by the police. Therefore, the IJ reasoned that the police had performed their duties and the government did not condone the attacks against Reyes-Hoyes. [1]

Reyes-Hoyes appealed to the BIA, which dismissed her appeal on January 22, 2020. The BIA found that Reyes-Hoyes did not prove that she suffered past harm rising to the level of persecution. After noting that she was therefore not entitled to a presumption of a well-founded fear of persecution, the BIA agreed with the IJ that Reyes-Hoyes did not show that the Guatemalan government either condoned the harm or was completely helpless to protect her. The BIA further found that Reyes-Hoyes did not demonstrate that she could not avoid further persecution by relocating within

---

[1] The IJ also determined that Reyes-Hoyes had not proven nexus, *i.e.* that she had been persecuted on account of a protected ground, and, relatedly, concluded that her proposed PSG of "family members" or "domestic partners of politicians" was not socially distinct or defined with particularity. Last, the IJ determined that Reyes-Hoyes was not eligible for relief under the CAT.

No. 20-60133

Guatemala.[2]  The BIA did not mention credibility in its decision, nor did it adopt the IJ's findings.  Reyes-Hoyes filed a timely petition for review.

## II. Standard of Review

We review the BIA's decision and consider the immigration judge's decision only to the extent it influenced the BIA.  *Singh v. Sessions*, 880 F.3d 220, 224 (5th Cir. 2018).  Factual findings are reviewed for substantial evidence, and legal determinations are reviewed de novo.  *Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 444 (5th Cir. 2001).  Under the substantial evidence standard, we may not reverse a factual finding unless the evidence "compels" such a reversal—*i.e.*, the evidence must be "so compelling that no reasonable factfinder could conclude against it."  *Wang v. Holder*, 569 F.3d 531, 536–37 (5th Cir. 2009).  It is the petitioner's burden to demonstrate that the evidence compels a contrary conclusion.  *Zhao v. Gonzales*, 404 F.3d 295, 306 (5th Cir. 2005).

## III. Discussion

Reyes-Hoyes raises five issues on appeal.  She asserts that substantial evidence does not support the BIA's determinations regarding (1) past persecution, (2) state action, (3) internal relocation, (4) nexus, and (5) PSG.  While we agree with Reyes-Hoyes on the issue of past persecution if she is credible, we must vacate and remand for a determination of credibility, which the BIA failed to assess.  Further, we vacate the BIA's decision on the internal relocation and state action issues, as the BIA failed to meaningfully consider

---

[2] The BIA explicitly declined to consider Reyes-Hoyes's arguments regarding PSG and nexus.  Having affirmed the denial of asylum, the BIA also affirmed the IJ's findings that Reyes-Hoyes could not meet the higher burden for withholding of removal.  Additionally, the BIA found that Reyes-Hoyes did not meaningfully challenge the IJ's denial of protection under the CAT, and thus, deemed that issued waived.  On appeal to this court, Reyes-Hoyes does not advance a CAT claim.

No. 20-60133

relevant evidence. We lack jurisdiction to consider the remainder of Reyes-Hoyes's petition.[3] Therefore, the petition for review will be GRANTED in part and DISMISSED in part; the BIA's decision VACATED; and the case REMANDED to the BIA for further proceedings.

## A. Persecution

To establish eligibility for asylum, an applicant must prove that he or she qualifies as a "refugee." 8 U.S.C. § 1158(b)(1)(A), (B)(i). "A refugee is a person who is outside his or her country and is unwilling or unable to return 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Sharma v. Holder*, 729 F.3d 407, 411 (5th Cir. 2013) (quoting 8 U.S.C. § 1101(a)(42)(A)). The statute does not define "persecution," and the question of when harassment, harm, or abuse becomes sufficiently serious, severe, or extreme enough to constitute "persecution" has proven difficult to answer with consistency. *See Sirbu v. Holder*, 718 F.3d 655, 659 (7th Cir. 2013) ("Our cases reviewing denials of asylum can read like grim exercises in measuring the precise extent of human cruelty and misery.").

"Persecution is the 'infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive . . . , [and] in a manner condemned by civilized governments. The harm or suffering need not be physical,' but the persecutor must be said to have engaged in

---

[3] The issues of nexus and PSG are not properly before us because the BIA expressly declined to address those issues. *See Singh*, 880 F.3d at 224. The BIA will have the opportunity to consider those issues on remand. Further, we lack jurisdiction to consider Reyes-Hoyes's argument that she can establish a well-founded fear of future persecution based on a "pattern or practice" of persecution against persons in Guatemala similarly situated to her, as this argument was not exhausted before the BIA as required. 8 U.S.C. § 1252(d)(1); *Wang v. Ashcroft*, 260 F.3d 448, 452-53 (5th Cir. 2001).

No. 20-60133

'extreme conduct.'" *Morales v. Sessions*, 860 F.3d 812, 815 (5th Cir. 2017) (quoting first *Abdel-Masieh v. I.N.S.*, 73 F.3d 579, 583 (5th Cir. 1996) (internal quotations omitted), then *Tesfamichael v. Gonzales*, 469 F.3d 109, 116 (5th Cir. 2006)). "Examples of persecution include, but are not limited to, 'threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom.'" *Id.* (quoting *Fei Mei Cheng v. Attorney Gen. of U.S.*, 623 F.3d 175, 192 (3d Cir. 2010) (internal quotations omitted)).

Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Eduard v. Ashcroft*, 379 F.3d 182, 187 n.4 (5th Cir. 2004) (citation omitted). "An applicant may establish past persecution on the basis of the cumulative effects of multiple incidents even if each incident, considered in isolation, would not rise to the level of persecution." *Lin v. Holder*, 478 F. App'x 219, 227 (5th Cir. 2012) (citing *Eduard,* 379 F.3d at 188).

Reyes-Hoyes testified to a pattern of incidents and acts of harm over a five-year time period, from shortly after Federico's murder in November 2010 to January 2016 when she fled Guatemala with her children. These include: (1) Reyes-Hoyes receiving an unspecified number of text messages and letters saying that she "needed to leave thing as they were"; (2) people passing by Reyes-Hoyes's house and shooting guns in the air; (3) Marvin DeLeon and another man attempting to kidnap her daughter after school; (4) the DeLeons beating Reyes-Hoyes and throwing her merchandise on the ground when they saw her at the market in Mesata; and (5) the DeLeons

beating her when she returned to her home in Pajapita and holding a gun to her older son Kevin's head. [4]

While this testimony was accurately recounted in the IJ's decision, the BIA's decision, which is the decision before us for review, misstated the record and erroneously referred to a "single beating"—the one the occurred at the market in Mesata—inexplicably omitting any mention of the second beating that occurred in Reyes-Hoyes's home upon her return to Pajapita. The BIA also failed to consider the testimony that a pistol was held to Reyes-Hoyes's older son Kevin's head during the same incident. This was a significant procedural error on the part of the BIA. In addition to reviewing whether substantial evidence supports the BIA's decisions, "we generally also review the BIA's decision 'procedurally' to ensure that the complaining alien has received full and fair consideration of all circumstances that give rise to his or her claims." *Abdel-Masieh*, 73 F.3d at 585 (quotation omitted). "While we do not require that the BIA address evidentiary minutiae or write any lengthy exegesis, its decision must reflect meaningful consideration of the relevant substantial evidence supporting the alien's claims." *Id.* (internal citation omitted). "[T]he BIA's failure to consider relevant substantial evidence is a 'fail[ure] to comply with its responsibilities.'" *Morales Lopez v.*

---

[4] We assume the murder of Reyes-Hoyes's husband does not establish past persecution because there is no suggestion his murder was intended to cause her harm. *See Morales*, 860 F.3d at 816 ("Neither we nor the BIA has ever held that an alien can seek asylum based upon the alleged past-persecution of another."). But the parties analyze the attempted kidnapping of Reyes-Hoyes's daughter and the harm suffered by her older son during the second beating (to the degree it was addressed, see *infra*) as being intended to cause her harm. In our analysis, we adopt this understanding that the harm suffered by Reyes-Hoyes's children was inflicted with the intention that it cause emotional harm to her. *See Martinez-Lopez v. Barr*, 943 F.3d 766, 771 (5th Cir. 2019) (recognizing that harm inflicted on petitioner's friend or relative can constitute persecution if persecutor inflicts harm for purpose of causing emotional harm to petitioner herself); *Kane v. Holder*, 581 F.3d 231, 239 (5th Cir. 2009) (same).

*Garland*, 852 F. App'x 758, 767 (5th Cir. 2021) (quoting *Sanon v. I.N.S.*, 52 F.3d 648, 652 (7th Cir.1995)).  In this case, by failing to address credible testimony of significant harm—a beating in one's home, with one's children present, and with a gun held to one child's head—the BIA fell short.

In its appellate brief, the Government then also misstated the record by asserting that Reyes-Hoyes only suffered "one beating."  Unlike the BIA, however, the Government's brief referred to the second beating that occurred in January 2016 in Pajapita.  At oral argument, the Government initially maintained that Reyes-Hoyes had only been beaten once, before admitting its error after it was brought to counsel's attention by the court.  Counsel for the Government nonetheless appeared to maintain that substantial evidence still supported the BIA's determination that the harm inflicted upon Reyes-Hoyes did not rise to the level of persecution, before suggesting that if the court disagreed it should vacate and remand to the BIA for reconsideration of the issue.  We disagree that substantial evidence supports the BIA's determination if Reyes-Hoyes is credible, but because the BIA failed to assess her credibility, we must remand for that determination.

Here, Reyes-Hoyes was beaten twice, and these incidents were serious.  One of the beatings occurred in her home, in the presence of her children, while a gun was held to her older son's head.  The Government was not able to identify any case holding that two beatings, including one in the home with children present, was insufficiently severe to constitute persecution.  Furthermore, the two beatings were not the only relevant incidents of persecution.

Acts of persecution take many forms.  In *Tamara-Gomez v. Gonzalez*, we held that evidence that the petitioner had been repeatedly targeted with credible death threats, coupled with vandalism to his home and threats to his family, compelled a conclusion of persecution, even though the petitioner

had not been physically harmed at all.  447 F.3d 343, 348 (5th Cir. 2006).[5] There are factual similarities between *Tamara-Gomez* and this case.  In both cases, the petitioner was subjected to credible threats and targeted at his or her home.  *Id.* at 345-46.  Further, in both cases family members were also targeted with threats or were harmed.  In *Tamara-Gomez*, persecutors threatened to kidnap the petitioner's sons and force them to join a guerilla group.  *Id.* at 346.  Here, the DeLeons attempted to kidnap Reyes-Hoyes's daughter, and they held a gun to her older son's head in her presence.[6]

There are also factual differences.  In *Tamara-Gomez*, the persecutors targeted the petitioner with continued threats after he moved to a new town in an attempt to escape them, while Reyes-Hoyes testified that she was not sure whether the DeLeons sought her out in Raul or were there by coincidence.  But the DeLeons did target Reyes-Hoyes at her home immediately upon her return to Pajapita, attacking her and her family on the very same day they returned.  And the persecution in this case occurred over a longer time period that in *Tamara-Gomez*.  Reyes-Hoyes was last attacked more than five years after the persecution began, while the persecution in *Tamara-Gomez* occurred for a year before the petitioner fled the country.  *Id.* at 345-46.  And, of course, in *Tamara-Gomez* the petitioner suffered no direct physical harm, while Reyes-Hoyes was beaten twice and her children were also threatened with imminent harm, including once in her presence when a gun was held to her son's head.

---

[5] Ultimately, our court denied the petition for review in *Tamara-Gomez* because the petitioner could not establish nexus.  447 F.3d at  349-50.  Here, the BIA explicitly declined to address the IJ's nexus finding, so this issue is not before us on appeal.

[6] Moreover, in both cases the petitioner's claims were consistent with, and corroborated by, country condition reports and evidence of similar attacks against similarly-situated persons.  *Tamara-Gomez*, 447 F.3d at 346-348.

*Tamara-Gomez* emphasizes a key facet of our persecution jurisprudence: that repeat incidents, a pattern of incidents, or a showing that a petitioner was targeted over a period of time makes it more likely that the evidence will compel the conclusion that he or she suffered persecution. *Id.* at 348–49; *see also Gjetani v. Barr*, 968 F.3d 393, 398 (5th Cir. 2020). In other words, evidence of harm that is systematic, sustained, or targeted is more likely to compel a conclusion of persecution than harm that is isolated or sporadic.

Though unpublished, *Morales Lopez v. Garland* also illustrates how a sustained pattern of threats, intimidation, and harm to family members can constitute persecution even absent severe physical harm to the petitioner, and it shares factual similarities with the present case. In *Morales Lopez*, the petitioner's husband had been murdered by a gang after being threatened for two years. 852 F. App'x at 761. Shortly thereafter, the petitioner started receiving threatening phone calls. She was also threatened by gang members when she was leaving her mother-in-law's house; her son was threatened by gang members while he was at school; her mother and brother were told to leave their homes by gang members; and her cousin was attacked with a machete. *Id.* at 761–62. Approximately nine months after her husband was murdered, the petitioner and her daughter left the country. *Id.* at 762. Our court concluded that the evidence compelled a conclusion of past persecution, and that, in concluding otherwise, the BIA erred by not considering the evidence as a whole. *Id.* at 770-71. In *Morales Lopez*, like in this case, the BIA also failed to consider uncontroverted evidence of persecution. *Id.* at 772.

Applying the forgoing to the facts of this case, the evidence compels a conclusion that the harm suffered by Reyes-Hoyes was so severe as to constitute persecution. The harm that the DeLeons inflicted on Reyes-Hoyes clearly amounted to more than "isolated incidents of verbal

harassment or intimidation" and instead involved both "physical punishment" and other significant "infliction of harm." *See Eduard*, 374 F.3d at 187 n.4. The guns fired in the air outside of her house did not cause physical harm, but certainly went beyond mere threats and added an element of credibility to the threatening messages that Reyes-Hoyes was receiving at the time. *See Tamara-Gomez*, 447 F.3d at 348 (in conjunction with threats, vandalism to home was act of persecution); *Qorane v. Barr*, 919 F.3d 904, 910 (5th Cir. 2019) (suggesting that threats that are credible and have sense of immediacy may be acts of persecution). Further, two of the incidents (the beating in the market and the beating at her home) involved physical harm to Reyes-Hoyes, while one incident (the attempted kidnapping) involved physical harm to her daughter and one incident (the beating at her home) involved physical harm to her older son, in the form of a gun held to his head, in her presence. *See Martinez-Lopez*, 943 F.3d at 771 (harm inflicted on family member or friend can be act of persecution if intended to harm petitioner); *Tamara-Gomez*, 447 F.3d at 348 (threat to kidnap son was act of persecution); *Morales Lopez*, 852 F. App'x at 761–62 (threats and harm to family was persecution).

Additionally, the beating in the market occurred even though Mesata is more than seven hours away from Pajapita, and the beating in Reyes-Hoyes's home in Pajapita took place on the very day that she returned to the town after an absence of more than five years (during which, as discussed in the next section, she moved three times in an attempt to avoid the DeLeons). The attack in Mesata, a distant locale, and the immediate attack upon her return to Pajapita, where the DeLeons sought her out at home, shows that her attackers continued to target her over a sustained period of time. *Cf. Abdel-Masieh*, 73 F.3d at 581–84 (record did not compel finding of past persecution when two beatings were result of being detained while participating in mass demonstrations and there was no evidence that

persecutors otherwise attempted to locate or harm petitioner).  In other words, the persecution was recurring, and not isolated.  *Cf. Gjetani*, 968 F.3d at 395, 398-99 ("one-off incidents" that were "unlikely to recur" did not compel finding of persecution).[7]

Based on all of the evidence as a whole, and in light of the applicable caselaw, Reyes-Hoyes has made a compelling case of persecution. Nevertheless, we find a remand is necessary because the BIA did not make a determination as to Reyes-Hoyes's credibility.  The BIA did not mention credibility in its decision or express any doubts about the truth of Reyes-Hoyes's testimony.  The IJ did express some doubts about Reyes-Hoyes's credibility, although he did not explicitly find her uncredible and ultimately stated he was not denying relief "based on a lack of sufficiency of proof." However, the BIA did not adopt the IJ's decision and thus did not incorporate any of the doubts the IJ had. "Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands." *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002).  If Reyes-Hoyes is credible, she has shown persecution, but the credibility determination must be made by the factfinder, not by this court on appeal. *See* 8 U.S.C. § 1158(b)(1)(B)(iii); *Avelar-Olivia v. Barr*, 954 F.3d 757, 767 (5th Cir. 2020). Accordingly, the decision of the BIA is vacated in part, and we remand to the BIA for a determination on credibility.

---

[7] We also note that the persecution in this case is consistent with country condition evidence describing a climate of political violence against politicians, including local candidates for mayor, and their families.

No. 20-60133

## B. Internal Relocation

Next, Reyes-Hoyes challenges the BIA's conclusion that she failed to establish that she could not internally relocate to avoid future harm or that relocation would be unreasonable. An alien is not entitled to asylum if she could avoid future persecution by relocating to another part of her country "if under all the circumstances it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(2)(ii); *see also* § 1208.13(b)(1)(i)(B). [8]

As recognized by this court in *Singh v. Sessions*, the regulations governing asylum include a two-step analysis that considers whether the applicant could both safely and reasonably relocate. 898 F.3d at 522. *Singh* relied on the BIA's "excellent discussion" of internal relocation in *Matter of M-Z-M-R-*. *Id.* at 521 (citing *Matter of M-Z-M-R-*, 26 I & N. Dec. 28 (BIA 2012)). In *Matter of M-Z-M-R-*, the BIA explained that the "regulation sets forth a two-step approach for determining an applicant's ability to internally relocate and the reasonableness of expecting such relocation." 26 I & N. Dec. at 32. "Under the first step, an Immigration Judge must decide whether '[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality.' The second step of the inquiry is whether 'under all the circumstances, it would be reasonable to expect the applicant to do so.'" *Id.* (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)) (internal citations omitted).

---

[8] A finding of past persecution gives rise to a rebuttal presumption that an applicant has a well-founded fear of future persecution based on the same grounds. *See* 8 C.F.R. § 1208.13(b)(1). Whether the alien or the government bears the burden of proof on the internal relocation issue depends on whether the alien has demonstrated past persecution and whether the persecutor is a government or government-sponsored. *See id.* § 1208.13(b)(1)(ii), (b)(3).

First, "[f]or an applicant to be able to internally relocate safely, there must be an area of the country where he or she has no well-founded fear of persecution." *Id.* at 33. The relocation area "must present circumstances that are substantially better than those giving rise to a well-founded fear of persecution," because "the purpose of the relocation rule is not to require an applicant to stay one step ahead of persecution." *Id.* "If the first step of the internal relocation analysis shows that an applicant is able to internally relocate, the Immigration Judge must next determine whether 'under all the circumstances, it would be reasonable to expect the applicant to do so.'" *Id.* at 34 (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)). *Matter of M-Z-M-R-* also emphasized that IJs should assess the reasonableness of relocation by referring to the non-exhaustive list of factors contained in the regulations. *Id.* at 34–35. At the time that Reyes-Hoyes's case was decided, the regulations directed that, in assessing the reasonableness of internal relocations,

> adjudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. Those factors may, or may not, be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

8 C.F.R. § 1208.3(b)(3) (2020).[9]

---

[9] Effective January 19, 2021, the regulation was amended to:

adjudicators should consider the totality of the relevant circumstances regarding an applicant's prospects for relocation, including the size of the country of nationality or last habitual residence, the geographic locus of the alleged persecution, the size, numerosity, and reach of the alleged

No. 20-60133

Reyes-Hoyes testified that she relocated three times. First, she moved to Mesata, a town more than seven hours away from Pajapita. After two years of living there, the DeLeons discovered her in the market in Mesata, where she sold clothing to make a living, and beat her. After this beating, Reyes-Hoyes moved to Raul, a town an hour and half away from Mesata. She lived there for a little less than two years until she saw Marvin DeLeon in town. Although he did not see her and she testified that his presence in the town may have been a coincidence, out of fear that she would be discovered again she moved a third time to Guatemala City. Reyes-Hoyes testified that while in Guatemala City she and her three children lived for a short time with her brother-in-law, but that "it was very difficult" because she "didn't have space there" and "needed to work a lot" to support her three children, so she returned to live in her house in Pajapita, hoping that things had calmed down. On the day she returned, she and her children were attacked in her home by the DeLeons.

The BIA concluded that internal relocation was reasonable because Reyes-Hoyes "lived in Guatemala for 5 years after her partner was murdered before she left" and "has not demonstrated that she could not avoid further harm by relocating to [Raul], the capital, or elsewhere within Guatemala or that it would be unreasonable to expect her to do so." The BIA summarized Reyes-Hoyes's testimony as such: "she lived in Mesata for 2 years until the incident at the market, then she lived in [Raul] without incident for almost 2 years before moving to the capital, and then she moved back to her hometown."

persecutor, and the applicant's demonstrated ability to relocate to the United States in order to apply for asylum.

8 C.F.R. § 1208.3(b)(3) (2021).

Similar to its past persecution finding, we are concerned that the BIA's internal relocation finding does not "reflect meaningful consideration of the relevant substantial evidence" in light of the applicable regulations. *Abdel-Masieh*, 73 F.3d at 585. First, the BIA failed to note that Reyes-Hoyes left Raul because she saw Marvin DeLeon there and became afraid that she would be discovered and attacked again. In other words, she did not live in Raul "without incident." Second, the BIA failed to note the difficulties that Reyes-Hoyes testified she faced in finding adequate work and housing for her and her children in Guatemala City. As explained below, vacatur and remand on this issue is warranted because of the lack of factual findings on whether it was reasonable for Reyes-Hoyes to relocate in light of her testimony.

We conclude first that the BIA's internal relocation conclusion was at least in part not supported by substantial evidence. Reyes-Hoyes's relocation to Mesata cannot be characterized as safe, given that it ended with her being found and beaten by the DeLeons. Similarly, her relocation to Raul was unsuccessful; even though she was not physical harmed, the fact that she saw Marvin DeLeon in Raul and therefore had a reasonable fear of being discovered and harmed again compels the conclusion that Raul was not a safe location either. That a petitioner remained in her home country for a period of time after the persecution began can suggest that safe relocation is possible, but "the purpose of the relocation rule is not to require an applicant to stay one step ahead of persecution." *Matter of M-Z-M-R-*, 26 I & N. Dec. at 33. In this case, the evidence shows that Reyes-Hoyes had to move to a new town three times in four years in order to avoid the DeLeons—to Mesata, to Raul, and then to Guatemala City. The evidence compels the conclusion that relocation to Mesata and Raul was not reasonable per *Matter of M-Z-M-R-*, as neither location provided her with safety, much less with "circumstances that [were] substantially better than those giving rise to a well-founded fear of persecution" in the first place. *Id.*

19

No. 20-60133

Unlike the relocations to Mesata and Raul, the evidence does not compel the conclusion that *safe* relocation in Guatemala City was impossible. However, neither the IJ nor the BIA addressed Reyes-Hoyes's unchallenged testimony that relocation there was *unreasonable*. Reyes-Hoyes testified that living in Guatemala City was "very difficult" because of a lack of living space and the need for her to work a lot in order to support her children. These are the types of factors—economic, social, and familial—that *Matter of M-Z-M-R-* held are relevant to determining if relocation is reasonable. *Id.* at 34-35. Given the importance of this unresolved issue, we think that remand to the BIA to make findings and conclusions on whether relocation was reasonable in light of *Matter of M-Z-M-R-* is appropriate.[10] *See Abdel-Masieh*, 73 F.3d at 585 (holding that, in appropriate circumstances, "[w]here an agency has failed to comply with its responsibilities, we should insist on its compliance rather than attempt to supplement its efforts" (quoting *Sanon*, 52 F.3d at 652)). Accordingly, the BIA's decision is vacated in part.

## C. State Action

Last, Reyes-Hoyes challenges the BIA's conclusion that she did not establish past persecution or a well-founded fear of future persecution because she did not show that the Guatemalan government sponsored or sanctioned the persecution. To qualify for asylum "[t]he persecution must be inflicted under government sanction, including persecution by groups 'the government is unable or unwilling to control.'" *Garcia-Garcia v. Mukasey*, 294 F. App'x 827, 829 (5th Cir. 2008) (quoting *Adebisi v. I.N.S.*, 752 F.2d

---

[10] We note also that whether Reyes-Hoyes or the Government will bear the burden of proof on this issue is uncertain at this juncture because allocation of the burden of proof is contingent on other findings, namely whether Reyes-Hoyes proves past persecution and whether her persecution was government sponsored or sanctioned, that will need to be made by the BIA in the first instance on remand. *See* 8 C.F.R. § 1208.13(b)(1)(ii), (b)(3).

910, 904 (5th Cir. 1992).  On this issue of so-called "state action," the BIA affirmed the IJ's finding that the Guatemalan government did not condone the harm, nor was helpless to protect Reyes-Hoyes from the DeLeons.  We vacate and remand.

To support its conclusion, the BIA cited the following findings of the IJ:  (1) the DeLeons were a "specific family which had ties to a criminal organization that operated in three towns"; (2) "the head of this family was elected mayor" after Federico's murder "but is no longer the mayor"; (3) Reyes-Hoyes spoke with the police about Federico's murder but did not report any other incidents to the police; and (4) the "documentary evidence indicate[d] that the police conducted a raid of the criminal organization and one of the sons of the ex-mayor was killed in a police confrontation in 2017."

The BIA erred procedurally by not addressing key testimony regarding Reyes-Hoyes's interactions with the police.  *See Abdel-Masieh*, 73 F.3d at 585.  Reyes-Hoyes went to the police after Federico's murder and was told by a policeman named Polito that "you better leave the things the way they are if you don't want the same thing that happened to your husband to happen to you."   The IJ—inexplicably, given the lack of conflicting evidence—said that he interpreted Polito's message as "not necessarily a threat, it could be a legitimate warning" because "[c]onsidering the respondent's testimony that this family of criminals, in her words, practically owned the town, this could have been a friendly warning on the part of this particular police officer."  This finding—that Polito was giving Reyes-Hoyes a "friendly warning"—is speculative and not based on evidence in the record.  Moreover, even if Polito was offering a "friendly warning," the IJ's explanation for the warning—that the DeLeons owned the town and the head of the family had served a term as mayor—actually suggests that the authorities were "unable or unwilling" to control them.  As either an express threat condoning future persecution, or as a "friendly warning" that the

government would or could do nothing to prevent future persecution, this statement from the police officer is evidence of state action.  To the extent that the BIA implicitly relied on the IJ's findings to conclude otherwise, its conclusion was not supported by the evidence.

Additionally, Reyes-Hoyes explicitly linked her visit to the police with the beginning of the threats against her and her children: "After I made the complaint to the police the threats began."  And, when asked if she reported the attempted kidnapping of her daughter to the police, Reyes-Hoyes said no because "I already reported the first time and I didn't receive any support."  Combined with Polito's statement, Reyes-Hoyes's testimony that she started to receive threats shortly after she made her report to the police provides an explanation for her not reporting the other incidents—she feared going to the police would be futile or would make the persecution worse.  *See Arevalo-Velasquez v. Whitaker*, 752 F. App'x 200, 201–02 (5th Cir. 2019) (recognizing that "the BIA did not establish a rule that an applicant is required to report her abuse to establish the government is unable or unwilling to control her abuser" and that evidence could show that reporting would lead to "worsened" circumstances) (citing *In re S-A-*, 22 I & N Dec. 1328, 1332–33, 1335 (BIA 2000)); *see also Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1069 (9th Cir. 2017) ("Whether a victim has reported or attempted to report violence or abuse to the authorities is a factor that may be considered, as is credible testimony or documentary evidence explaining why a victim did not report."). The BIA did not meaningfully address this testimony in its decision.

Last, the BIA did not contextualize the documentary evidence concerning the police raid and the death of Guillermo DeLeon.  The newspaper article referred to a "confusing incident that arose during an operation"—part of a series of drug raids carried about by the National Police—during which Guillermo DeLeon "lost his life after attacking with a

machete the agents who would carry out a raid in the sector where he lived." Further, the article states that the National Police "did not specify if the former mayor's [Isidro DeLeon's] house was one of the objectives of the operations." In addition to these ambiguities, the BIA should have considered whether National Police "drug raids" show that the Government is able and willing to combat political violence against Reyes-Hoyes, especially when the country condition evidence describing a climate of political violence against politicians and their families.

Given the BIA's failure to meaningfully consider this "key evidence," we vacate the BIA's decision on state action and remand for a more thorough consideration. *See Abdel-Masieh*, 73 F.3d at 585.[11]

---

[11] *See, e.g.*, *Matei v. Garland*, No.22-60144, 2023 WL 2535259, at *4 (5th Cir. Mar. 16, 2023) (per curiam) (unpublished) (holding the BIA procedurally erred when "when the only evidence cited comes from an older country report, that evidence is improperly attributed to more recent country reports, and there is no indication that the IJ considered the treatment of [the applicant] actually described in the more recent country reports"); *Aguando-Cuevas v. Garland*, No. 21-60574, 2022 WL 17546291, at *4 (5th Cir. Dec. 9, 2022) (unpublished) ("Although it is possible that the BIA and IJ considered but declined to mention this portion of [the applicant's] testimony, any such consideration is not apparent in the record. As such, the BIA erred by not applying the correct legal framework in which it must show that it meaningfully considered 'relevant substantial evidence supporting the alien's claims.'" (quoting *Abdel Masieh*, 73 F.3d at 585)); *Emmanuel-Tata v. Garland*, No. 20-60487, 2022 WL 126982, at *3 (5th Cir. Jan. 12, 2022) (per curiam) (unpublished) (finding BIA's statement that the record did not contain relevant evidence, when the record did contain relevant evidence, weighed in favor of finding that the applicant "did not receive 'meaningful consideration of the relevant substantial evidence supporting' his claims." (citing *Abdel-Masieh*, 73 F.3d at 585)); *Adjonke v. Mukasey*, 255 F. App'x 914, 915 (5th Cir. 2007) (per curiam) (unpublished) (stating court was "not convinced that [applicant] received full and fair consideration of the circumstances giving rise to his claims" when the IJ noted improvements in 2004 but did not discuss evidence of deterioration in 2005); *cf. Ndifon v. Garland*, 49 F.4th 986, 990 (5th Cir. 2022) (finding statement that applicant "points to no other objective evidence to support his . . . claim," when applicant did present other evidence, to weigh in favor of concluding BIA did not adequately consider the evidence supporting CAT claim).

## IV. Conclusion

In sum, we conclude that, if Reyes-Hoyes is credible, the record compels the conclusion that Reyes-Hoyes suffered harm rising to the level of past persecution, but we remand for the BIA to consider her credibility in the first instance. We also conclude that the record compels the conclusion that safe internal relocation to parts of Guatemala—Mesata and Raul—was not possible. Additionally, we hold that the BIA procedurally erred in the remainder of its analysis concerning whether internal location was reasonable and whether Reyes-Hoyes had shown state action by not meaningfully considering the relevant substantial evidence. Finally, we lack jurisdiction over the remaining portions of Reyes-Hoyes's petition.

Accordingly, the petition for review is GRANTED in part and DISMISSED in part; the decision of the BIA is VACATED; and the case is REMANDED for further proceedings consistent with this opinion.